Exhibit 5

```
 1              UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3

 4  NEFTALI MONZON, as Personal   )
    Representative of the         )
 5  Estate of JUNEF RAGADIO       )
    MONZON and individually;      )
 6  MARYLOU MONZON, as Personal   )
    Representative of the         )
 7  Estate of JUNEF RAGADIO       )
    MONZON and individually;      )
 8  JERRICO REYES, an             )
    individual,                   )
 9                                )
            Plaintiffs,           )
10                                )
       v.                         )  Case No.
11                                )  2:17-CV-13712
    CITY OF MURRIETA, a           )
12  governmental entity; SCOTT    )
    MONTEZ, an individual;        )
13  CHRIS ZELTNER, an             )
    individual; KYLE MIKOWSKI,    )
14  an individual; ZACH           )
    BRADLEY, an individual AND    )
15  BLAKE WILLIAMS, an            )
    individual, and DOES 1        )
16  through 10,                   )
                                  )
17          Defendants.           )
    _____)
18

19            DEPOSITION OF ZACHERY BRADLEY

20         MONDAY, OCTOBER 8, 2018, 10:07 A.M.

21               CORONA, CALIFORNIA

22

23      Reported by R. Kelly Jacobson, CSR No. 8361
                CLS Job No. 90156A
24

25            CENTEXTLEGAL.COM - 855.CENTEXT
```

```
 1              UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3

 4   NEFTALI MONZON, as Personal     )
     Representative of the           )
 5   Estate of JUNEF RAGADIO         )
     MONZON and individually;        )
 6   MARYLOU MONZON, as Personal     )
     Representative of the           )
 7   Estate of JUNEF RAGADIO         )
     MONZON and individually;        )
 8   JERRICO REYES, an               )
     individual,                     )
 9                                   )
             Plaintiffs,             )
10                                   )
        v.                           )   Case No.
11                                   )   2:17-CV-13712
     CITY OF MURRIETA, a             )
12   governmental entity; SCOTT      )
     MONTEZ, an individual;          )
13   CHRIS ZELTNER, an               )
     individual; KYLE MIKOWSKI,      )
14   an individual; ZACH             )
     BRADLEY, an individual AND      )
15   BLAKE WILLIAMS, an              )
     individual, and DOES 1          )
16   through 10,                     )
                                     )
17           Defendants.             )
     _____)

18

19

20      DEPOSITION OF ZACHERY BRADLEY, taken at

21   4740 Green River Road, Suite 203, Corona, California, on

22   Monday, October 8, 2018, at 10:07 a.m., before

23   R. Kelly Jacobson, Certified Shorthand Reporter, in and

24   for the State of California.

25
```

2

ZACHERY BRADLEY                                    October 8, 2018

```
 1    APPEARANCES:
 2
 3    For Plaintiffs:
 4               LAW OFFICES OF DALE K. GALIPO
                 BY:  DALE K. GALIPO, ESQ.
 5               21800 Burbank Boulevard, Suite 310
                 Woodland Hills, California 91367
 6               818.347.3333
                 dgalipo@galipolaw.com
 7
                         -and-
 8
                 LAW OFFICES OF DALE K. GALIPO
 9               BY:  MARCEL F. SINCICH, ESQ.
                 21800 Burbank Boulevard, Suite 310
10               Woodland Hills, California  91367
                 818.347.3333
11               msincich@galipolaw.com
12                       -and-
13               THE SEHAT LAW FIRM
                 BY:  CAMERON SEHAT, ESQ.
14               18881 Von Karman Avenue, Suite 850
                 Irvine, California  92612
15               949.825.5200
                 cameron@sehatlaw.com
16
      For Defendants:
17
                 FERGUSON, PRAET & SHERMAN
18               BY:  PETER J. FERGUSON, ESQ.
                 1631 East 18th Street
19               Santa Ana, California 92705
                 714.953.5300
20
                         -and-
21
                 FERGUSON, PRAET & SHERMAN
22               BY:  ALLEN CHRISTIANSEN, ESQ.
                 1631 East 18th Street
23               Santa Ana, California  92705
                 714.953.5300
24               achristiansen@law4cops.com
25
```

3

1        APPEARANCES CONT.

2

         Also Present:
3
                     SCOTT MONTEZ
4
     CHRISTOPHER ZELTNER
5
     BLAKE WILLIAMS
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

ZACHERY BRADLEY                          October 8, 2018

```
 1          A    Thank you.
 2          Q    And what is that going to be in?
 3          A    Law enforcement leadership.
 4          Q    Okay.  You went to the police academy at some
 5     point?
 6          A    Yes, I did.
 7          Q    When did you do that?
 8          A    April of 2008 until October 1st of 2008.
 9          Q    Okay.  And what type of work did you generally
10     do before you went to the academy?
11          A    I was in the United States Marine Corps.
12          Q    From what years?
13          A    June of 2003 until April of 2008.
14          Q    And where did you go to the academy?
15          A    I went to the San Diego Regional Academy.
16          Q    Okay.  You have some training there with
17     respect to tactics?
18          A    Yes.
19          Q    And use of force?
20          A    Yes.
21          Q    Would that include both deadly force and less
22     lethal force?
23          A    Yes.
24          Q    Did you have to study something called POST
25     Learning Domains?
```

11

ZACHERY BRADLEY                                    October 8, 2018

1          A    Yes.

2          Q    After graduating from the academy where did

3      you first go to work?

4          A    The San Diego Police Department.

5          Q    Okay.  And how long were you there for?

6          A    I was employed with San Diego Police from

7      April of 2008 until July of 2014.

8          Q    Okay.  What was your position or positions,

9      generally, there?

10         A    Patrol officer.

11         Q    Okay.  And when -- did you come to Murrieta

12     Police Department at some point?

13         A    Yes, I did.

14         Q    And when was that?

15         A    July of 2014.

16         Q    Do you remember the approximate date of this

17     incident we're here to talk about?

18         A    I believe so.

19         Q    What is your best recollection?

20         A    October 22nd, 2016.

21         Q    Okay.  What was your assignment at the time?

22         A    I was working overtime in patrol.

23         Q    You were in a uniform?

24         A    Yes, I was.

25         Q    And in a marked vehicle?

12

ZACHERY BRADLEY                                    October 8, 2018

1          about the case.

2               Q    Okay.  Let's talk a little bit about this

3          case.

4                    At some point you hear a call and you respond?

5               A    Yes.

6               Q    And there was a vehicle pursuit?

7               A    After I had already responded.

8               Q    Right.  At some point, you were the second car

9          in the pursuit?

10              A    Yes.

11              Q    Did you have an understanding as to who was in

12         the first car?

13              A    Yes.

14              Q    And who was that?

15              A    Officer Zeltner.

16              Q    Okay.  And are the other officers that were

17         involved in the incident here in this room today?

18              A    Most of them.

19              Q    Okay.  Which -- I don't know them by -- simply

20         by face, so this nice gentleman to your far right, who

21         is that?

22              A    Officer Zeltner.

23              Q    Okay.  And then the nice gentleman next to

24         you?

25              A    Sgt. Montez.

ZACHERY BRADLEY                                    October 8, 2018

```
 1          Q    And we have another nice gentleman at the end
 2     of the table.  Who is that?
 3          A    Officer Blake Williams.
 4          Q    Thank you.  I know these other two nice
 5     gentlemen on both sides of the table.
 6               So were you calling out the pursuit at some
 7     point?
 8          A    Toward the very end, yes.
 9          Q    Okay.  And the pursuit ended up on a -- on a
10     street or road where the shooting occurred?
11          A    Correct.
12          Q    Do you know the name of that street or road?
13          A    I believe it might be Mesa.
14          Q    Okay.  I have some pictures I'm going to show
15     you in a moment.
16               Before the pursuit got to Mesa, did you have
17     any information that the -- anyone in the vehicle that
18     you were pursuing had a weapon?
19          MR. FERGUSON:  Other -- you mean like a handgun?
20               Objection, vague.
21     BY MR. GALIPO:
22          Q    Yeah.  Like a handgun or a knife or anything
23     like that.
24          A    I did not know for sure anyone had a weapon
25     and I didn't know for sure anyone did not have a weapon.
```

15

ZACHERY BRADLEY                                    October 8, 2018

1          Q   Okay.  Fair to say you didn't have any

2     specific information one way or the other?

3          A   Yes.

4          Q   Okay.  Did you have any specific information

5     that anyone in the car had injured anyone?

6          A   Not yet.

7          Q   Okay.  During the pursuit were there any

8     accidents, actual collisions that you saw?

9          A   No.

10         Q   Did you know how many people were in the

11    vehicle?

12         A   I did not.

13         Q   Did you know if there were children in the

14    vehicle?

15         A   I did not.

16         Q   Would that be all the way up until the time of

17    the shooting?

18         A   Yes, it would.

19         Q   Did you have an understanding as to why the

20    vehicle was being pursued in the first place at the time

21    of the pursuit?

22         A   Yes, I did.

23         Q   What was your understanding?

24         A   The vehicle had been reported stolen.

25         Q   Okay.  All right.  So when the vehicle went

ZACHERY BRADLEY                                    October 8, 2018

1     obviously knew that there was a cul-de-sac because we

2     had reached the end of the road.

3         Q   Okay.  That's what I was trying to get at.

4     Okay.  Fair enough.

5         MR. GALIPO:  Okay.  I want to show you a few

6     photographs and I'll just identify some of them and then

7     we might talk about a few of them during your deposition

8     and -- wow.  They're even pre-numbered.  That's pretty

9     good.

10        (Exhibit 1 marked)

11    BY MR. GALIPO:

12        Q   All right.  Exhibit 1, does it look like that

13    was the vehicle that you were pursuing and that was

14    eventually involved in this incident?

15        A   Yes.

16        (Exhibit 2 marked)

17    BY MR. GALIPO:

18        Q   Exhibit 2, does this look to be a photograph

19    showing part of Mesa and a couple of patrol cars?

20        A   Yes.

21        Q   The front patrol car, would that be the

22    primary officer that was in the pursuit?

23        A   Primary and initiating officer, yes.

24        Q   And then it's hard to see a little bit, but

25    the vehicle directly behind that, that would be your

ZACHERY BRADLEY                                October 8, 2018

1       vehicle?

2            A    Yes.

3            (Exhibit 3 marked)

4       BY MR. GALIPO:

5            Q    All right.  Exhibit 3, does that show part of

6       Mesa from another angle?

7            A    It appears.

8            Q    Do you know which way Mesa runs?

9            A    I believe it runs north and south.

10           Q    Do you know which way when your vehicle -- at

11      some point your vehicle came to a stop on Mesa; is that

12      correct?

13           A    When I put the brakes on, yes.

14           Q    Right.  And you got out of your car at some

15      point, is that also correct?

16           A    Yes.

17           Q    Which way was the front of your car facing

18      when it -- after you put the brakes on and you came to a

19      stop and got out?

20           A    South.

21           Q    Okay.  Thank you.  So is this photograph,

22      Exhibit 3, generally looking to the south?

23           A    It appears to be.

24           Q    Okay.  Can you tell if either of the vehicles

25      depicted in Exhibit 3 is your vehicle that you were

19

ZACHERY BRADLEY                    October 8, 2018

```
 1        BY MR. GALIPO:
 2             Q    Thank you.  All right.
 3                  Exhibit 9, what does that show?
 4             A    It shows a deputy taking notes, the suspect's
 5        vehicle and it looks like Officer Zeltner's vehicle and
 6        probably my vehicle.
 7             (Exhibit 10 marked)
 8        BY MR. GALIPO:
 9             Q    All right.  Exhibit 10?
10             A    This one shows the deputy, the suspect's car,
11        Officer Zeltner's car and my car.
12             (Exhibit 11 marked)
13             (Exhibit 12 marked)
14        BY MR. GALIPO:
15             Q    Okay.  I'm going to show you two more and then
16        I'm going to ask you some questions.
17                  Exhibit 11 --
18             A    This shows Officer Zeltner's vehicle, my
19        vehicle.  It shows Officer Mikowski's vehicle after it
20        had been crashed into and moved and then
21        Officer Williams' vehicle.
22             Q    Okay.  Exhibit 12?
23             A    This shows the suspect's vehicle,
24        Officer Zeltner's vehicle, my vehicle.  And then like I
25        said, Officer Mikowski's vehicle after it had been run
```

24

ZACHERY BRADLEY                                    October 8, 2018

1        Q    Okay.  And when you pulled onto Mesa did you
2   have your lights and sirens on?
3        A    Yes, I did.
4        Q    And do you know if the patrol vehicle in front
5   of you also did?
6        A    I believe it did.  I know it definitely had
7   its lights on.
8        Q    Do you know if your -- at any time before the
9   shooting you activated your spotlights?
10       A    I don't recall if I did.
11       Q    Do you recall if any other units --
12       A    I don't recall.
13       Q    When you got out of your car, I'm assuming you
14   got out on the driver's side?
15       A    Yes.
16       Q    Where did you go to?
17       A    I went to the front passenger side of the
18   vehicle in front of me.
19       Q    Okay.  And whose vehicle was that again?
20       A    Officer Zeltner's.
21       Q    Why did you go there?
22       A    To conduct a hot stop.
23       Q    You were envisioning a series of commands that
24   you're trained to do in that type of situation?
25       A    Yes.

ZACHERY BRADLEY                                          October 8, 2018

1          Q    Would it be fair to say it -- it never got to

2     that because the vehicle continued to move?

3          A    Commands were given.

4          Q    Did you give any commands?

5          A    Yes.

6          Q    What were your commands?

7          A    To stop the vehicle and get out.

8          Q    And anything else?

9          A    "Show us your hands."

10         Q    Anything else?

11         A    I kept repeating "stop the vehicle."

12         Q    Okay.  Did you see the vehicle make a turn at

13    some point when it got to the end of the street?

14         A    Yes, I did.

15         Q    Can you describe what you observed the vehicle

16    do regarding the turn?

17         A    It appeared to be like a multi-point U-turn.

18         Q    Like a three-point turn?

19         A    I think it was more than three.  I don't --

20    I'm not a hundred percent sure.

21         Q    Okay.  In any event, it looked like it was

22    turning around?

23         A    Yes.

24         Q    And at that point did you -- at least you have

25    the impression that there was a -- a cul-de-sac?

ZACHERY BRADLEY                                    October 8, 2018

1          A    Yes.

2          Q    And were you -- when the vehicle was turning

3     around, were you on the passenger side of the first

4     patrol vehicle?

5          A    Yes.

6          Q    Okay.  And did you know where any of the other

7     officers were at that point when the vehicle was turning

8     around?

9          A    At the moment it was turning around I only

10    knew that Officer Zeltner was on the driver's side of

11    his vehicle.

12         Q    Okay.  And do you know if the -- either one of

13    the doors, either the passenger or driver's door were

14    open at that time?

15         A    Of whose vehicle?

16         Q    The vehicle you were standing next to.

17         A    I know the passenger door wasn't open.  I'm

18    not sure if he had the driver's open.  I didn't have a

19    chance to open it.  It was that quick.

20         Q    Okay.  The position that you chose -- and I'll

21    show you Exhibit 10 -- am I correct that the second

22    vehicle would be your vehicle, the one I'm pointing to?

23         A    That is my vehicle.

24         Q    I'm just going to put a circle around it.

25              Why did you position your vehicle in that

29

ZACHERY BRADLEY                                October 8, 2018

1     position?

2           A    The training that we received in San Diego has

3     us fan our vehicles out and offset.

4           Q    Okay.  Did you have -- based on your training

5     up to that point in time, did you believe you could

6     shoot at this vehicle merely for fleeing?

7           A    No.

8           Q    And what training did you have in that regard

9     that you could not shoot at a vehicle such as a stolen

10    vehicle merely for fleeing?

11          A    The academy, briefing trainings, policy and

12    procedures at both agencies.

13          Q    Okay.  Did you have any training with respect

14    to in a pursuit, particularly in a scenario like this

15    where the vehicle may come to a residential street or

16    possibly a dead end or a cul-de-sac, whether you should

17    position your vehicle to block the car in?

18          MR. FERGUSON:  Objection, calls for speculation.

19    Vague and ambiguous.  Overbroad.

20    BY MR. GALIPO:

21          Q    Your fine lawyer is going to be making some

22    objections, but as long as you understand my question

23    and -- and unless he instructs you not to answer,

24    you're -- you're allowed to answer the question.

25          A    Can you just kind of repeat it?

ZACHERY BRADLEY                                     October 8, 2018

1          Q    Sure.   Did you have any training with respect
2    to whether you should or should not block in a fleeing
3    vehicle?
4          A    Yes.
5          Q    What is your training in that regard?
6          A    Generally should not block vehicles in.
7          Q    Okay.   And what were you trained in that
8    regards?   Why should you not block vehicles in?
9          A    Because it creates a dangerous situation.
10         Q    So it looks like in the position that your car
11   is parked, you're not in a position to block the car in.
12              Is that fair?
13         A    That is fair.
14         Q    And were you attempting to block the car in in
15   any way when you positioned your car?
16         A    Absolutely not.
17         Q    Okay.   Did it appear to you that the patrol
18   car in front of yours was positioned to block the car
19   in?
20         A    No.
21         Q    Okay.   Did you ever see an impact between the
22   stolen vehicle and your car?
23         A    My police car?
24         Q    Yes.
25         A    No.

31

ZACHERY BRADLEY                                    October 8, 2018

1          Q    Why did you start moving back towards your

2     car?

3          A    Based on the way the vehicle was turning

4     around I thought it was going to flee again and I was

5     moving back to my vehicle to continue the pursuit.

6          Q    Okay.  When -- when you say "the way the

7     vehicle was moving around," you mean observing it doing

8     this turning motion, turning movement?

9          A    Yes.

10         Q    Okay.  Did you, yourself, ever actually see

11    the vehicle strike Officer Zeltner's car?

12         A    I may have, but I do remember hearing it.

13    I -- I wouldn't have seen the impact because it was on

14    the other side.  I wouldn't have seen the vehicle moving

15    at that time.

16         Q    Do you have any understanding as to what part

17    of the van struck what part of Officer Zeltner's car?

18         A    I don't recall.

19         Q    Okay.  I take it when the van was turning

20    around it was going relatively slow.

21              Is that fair?

22         MR. FERGUSON:  Objection, vague.

23    BY MR. GALIPO:

24         Q    You may answer.

25         A    I believe -- it appeared to me that it was

ZACHERY BRADLEY                                    October 8, 2018

1          trying to move around rapidly.

2                  Q    Do you have any estimate as to its speed as

3          it --

4                  A    No.

5                  Q    -- was turning around?

6                  A    No.

7                  Q    Okay.  When, in your mind, you thought the

8          vehicle was going to continue to flee, did you

9          immediately think you should shoot the driver?

10                 A    No.

11                 Q    And why not based on your training?

12                 A    Because at that point in time it's more

13         dangerous to shoot the driver than to not.  We had a

14         stolen vehicle and felony evading at that point.

15                 Q    Why, based on your training, would it be more

16         dangerous to shoot the driver?

17                 A    When the driver's not presenting a threat and

18         you shoot them you can render the vehicle into a more

19         dangerous situation.

20                 Q    As part of your training were you trained that

21         shooting the driver of a moving vehicle could disable

22         the driver?

23                 A    When shooting at the driver?

24                 Q    Right.

25                 A    Yes.

34

ZACHERY BRADLEY                                    October 8, 2018

1          Q    And it could make it difficult for the driver
2     to safely operate the car?
3          A    Correct.
4          Q    Okay.  So when you say more dangerous, I'm
5     sure there's a lot of aspects to that, but one of the
6     parts would be disabling the driver and causing the
7     driver not to be able to safely drive the car?
8          MR. FERGUSON:  Objection, vague.
9     BY MR. GALIPO:
10         Q    Is that fair?
11         A    Yes.
12        (Exhibit 14 marked)
13        (Exhibit 15 marked)
14    BY MR. GALIPO:
15         Q    Okay.  I want to show you Exhibit 14.
16              At any time before you fired your shots, did
17    you give any verbal warning that you were going to
18    shoot?
19         A    No.
20         Q    At any time -- strike that.
21              Did you hear shots before you fired your
22    shots?
23         A    Yes, I did.
24         Q    How many shots did you hear, approximately?
25         A    I don't recall.

ZACHERY BRADLEY                                    October 8, 2018

1          Q    Do you have any estimate?

2          A    No.

3          Q    Where were you or what were you doing when you

4     heard the first group of shots?

5          A    I was still moving back towards my vehicle.

6          Q    At any time before you heard the first group

7     of shots, did you, based on your observation, see anyone

8     that appeared to be about to be run over by the car?

9          MR. FERGUSON:  Objection --

10         THE WITNESS:  At -- at the time that I heard the

11    first set of shots, I did not see anybody that was about

12    to run over, but --

13    BY MR. GALIPO:

14         Q    Okay.

15         A    -- I had no visual observation of the driver's

16    side of the SUV.

17         Q    Okay.  Did you hear any warning that shots

18    were going to be fired from anybody before you heard the

19    first group of shots?

20         A    I did not.

21         Q    Were you expecting the first group of shots?

22         A    I was not.

23         Q    Were you surprised to hear those shots at the

24    time?

25         A    I was.

36

ZACHERY BRADLEY                                        October 8, 2018

1          Q    Did you know who was shooting at the time?

2          A    I did not.

3          Q    Did you have anything in your hands when you

4     heard the first group of shots?

5          A    My firearm.

6          Q    Okay.  So your firearm was still in your --

7     one of your hands?

8          A    Yes.

9          Q    Are you right-handed or left-handed?

10         A    I'm right-handed.

11         Q    Okay.  I notice that you have -- you're

12    wearing eyeglasses today?

13         A    Yes.

14         Q    And do you -- are you nearsighted or

15    far-sighted or --

16         A    I have astigmatism.

17         Q    Okay.  So it helps with that?

18         A    It does.

19         Q    When you work do you wear any corrective

20    lenses?

21         A    Sometimes if I remember them.

22         Q    Okay.  Do you know if you remembered to wear

23    them on the date of the incident or not?

24         A    I don't recall.

25         Q    Okay.  When you do remember to wear them,

37

ZACHERY BRADLEY                          October 8, 2018

```
 1          A    Similar, but I don't remember what it was for
 2     sure.
 3          Q    Okay.  Did you have similar type training at
 4     the police academy?
 5          A    Yes.
 6          Q    Okay.  And I'm going to just -- I'm going to
 7     read it into the record, but I'm going to read a
 8     sentence and then ask you a question --
 9          A    Okay.
10          Q    -- and the policy is 300.4.1 entitled
11     "Shooting at or from moving vehicles."
12          MR. FERGUSON:  Are you going to read the entire
13     policy?
14          MR. GALIPO:  Yes, I am.
15          MR. FERGUSON:  Okay.
16          MR. GALIPO:  I wouldn't want to leave anything out.
17     BY MR. GALIPO:
18          Q    "Shots fired at or from a moving vehicle are
19     rarely effective."
20               That's part of the policy, as you understand
21     it?
22          A    I believe that's the first sentence of the
23     policy.
24          Q    Yeah, and I don't mean to -- and that was part
25     of your training as well?
```

39

ZACHERY BRADLEY                                          October 8, 2018

1          A    Yes.

2          Q    Okay.  "Officers should move out of the path

3     of an approaching vehicle instead of discharging their

4     firearm at the vehicle or any of its occupants."

5               Is that part of the policy?

6               You can read the second sentence and see if I

7     read it correctly.

8          A    Yes.

9          Q    That was part of your training as well?

10         A    Yes.

11         Q    "An officer should only discharge a firearm at

12     a moving vehicle or its occupants when the officer

13     reasonably believes there are no other reasonable means

14     available to avert the threat of the vehicle, or if

15     deadly force, other than the vehicle, is directed at the

16     officer or others."

17               Is that your -- and you can double-check it.

18         A    Yes.

19         Q    Okay.  Now, the -- the -- and that's part of

20     the policy, as you understand it, and also part of your

21     training?

22         A    Yes.

23         Q    Okay.  So when it refers to "deadly force

24     other than the vehicle being directed at the officers,"

25     would that be like if the person in the car has a gun

ZACHERY BRADLEY                                          October 8, 2018

1    pointed at the officers?

2         A    Can you restate it?

3         Q    Yeah.   It says that "An officer should only

4    discharge a firearm at a moving vehicle or its occupants

5    when the officer reasonably believes there are no

6    reasonable means available to avert the threat of the

7    vehicle, or if deadly force other than the vehicle is

8    directed at the officer or others."

9         A    Yes.   Okay.

10        Q    So was it your understanding that the

11   reference to deadly force other than the vehicle would

12   be like if the person in the car has a gun pointed at

13   the officers?

14        A    I believe that's what that intends.

15        Q    Okay.   And then "No other reasonable means

16   available to avert the threat."   Is it your

17   understanding that would include being able to get out

18   of the way?

19        A    I believe that that means that if there's no

20   time to get out of the way, that that would be a

21   situation that would be okay to shoot.

22        Q    Okay.   So generally speaking, is it fair to

23   say that your general training as a police officer up to

24   this point in time was, first of all, if you have a

25   vehicle pursuit involving a stolen vehicle you cannot

41

ZACHERY BRADLEY                                    October 8, 2018

1    shoot the vehicle just for fleeing?

2             Is that fair?

3        A    Yes.

4        Q    And that if you can avoid blocking the car in

5    you should do that?

6        MR. FERGUSON:  Objection.  Misstates testimony.

7    Calls for speculation as framed.  Vague and ambiguous.

8    BY MR. GALIPO:

9        Q    Was that part of your training as well?

10       A    Yes.

11       Q    Okay.  And if you can avoid positioning

12   yourself in the path of the vehicle you should do that?

13       MR. FERGUSON:  Objection, incomplete hypothetical.

14   Vague and ambiguous.

15       THE WITNESS:  Yes.

16   BY MR. GALIPO:

17       Q    And if the vehicle appears to be coming in

18   your direction you should get out of the way if you can?

19       MR. FERGUSON:  Objection, incomplete hypothetical.

20   Vague and ambiguous.

21       THE WITNESS:  Only if the time allows, yes.

22   BY MR. GALIPO:

23       Q    Right.  Obviously, if the vehicle appears to

24   be coming in your direction and if time allows you

25   should get out of the way?

42

ZACHERY BRADLEY                    October 8, 2018

1      A    Yes.

2      Q    Rather than shooting?

3      A    If you have time and the option.

4      Q    Okay.  And that's generally your understanding

5  of the policy?

6      A    Yes.

7      Q    Okay.  So do you recall where you were in

8  relation to your car when you heard the first group of

9  shots?

10     A    I was approximately in between

11 Officer Zeltner's car and my car.

12     Q    Looking at Exhibit 12, you think you could

13 possibly make an X where you were, approximately, when

14 you heard the first group of shots?

15     A    (Witness complies).

16     Q    Okay.  Thank you.

17          And you made an X in between -- essentially in

18 between the two vehicles?

19     A    Between Officer Zeltner's car and my car, yes.

20     Q    Now, you -- you indicated that you were

21 initially on the passenger side of Officer Zeltner's

22 car; is that correct?  When you first went up to the

23 passenger side of his car.

24     A    When I went to conduct the hot stop, yes.

25     Q    Okay.  And were you -- I assume you initially

43

ZACHERY BRADLEY                                    October 8, 2018

 1       but more on the passenger side?

 2            A    I would -- yeah, on the passenger side, not in

 3       between the two cars.  I hadn't made it there.  I didn't

 4       have time.

 5            Q    Okay.  And when you hear the shots do you

 6       stop?

 7            A    Yes.

 8            Q    And do you look to see what's going on?

 9            A    Yes.

10            Q    And at that point do you see the van?

11            A    When I heard the shots first, no.

12            Q    I assume at the time you heard the shots you

13       did not see the van at that point?

14            A    Correct.

15            Q    The shots caused you to stop and look?

16            A    Yes.

17            Q    And when you stopped and looked, then you saw

18       the van?

19            A    Yes.

20            Q    Okay.  And do you have an estimate as to how

21       much time it was between hearing the shots and stopping

22       and looking?  Was it pretty quick --

23            A    Milliseconds.

24            Q    Milliseconds.

25            A    Yes.

ZACHERY BRADLEY                                    October 8, 2018

1          Q    Okay.  And then from looking, do you have an

2     estimate as to how soon you saw the van?

3          A    Almost immediately.

4          Q    Okay.  And where was the van, approximately --

5     and we can go back -- maybe we can even use Exhibit 10.

6     Where was -- or 12 or any other one you want.

7               Where was the van, approximately, when you

8     looked after hearing the shots and saw it?

9          A    It would have emerged -- looking at

10    Exhibit 10, it would have emerged on the driver's side

11    of Officer Zeltner's car.

12         Q    Okay.  In the -- were you looking at it,

13    essentially, through the space between the two cars?

14         A    Yes.

15         Q    Okay.  Now, do you know if your vehicle had

16    video recording equipment?

17         A    It had something like that, yes.

18         Q    And did you do anything in the investigation

19    to turn over either the audio or video?

20         A    I don't think it recorded like that.  The

21    video equipment I had was the LPRs, license plate

22    readers.

23         Q    Okay.

24         A    If you're referring to dash cams, I didn't

25    have a dash cam.

46

ZACHERY BRADLEY                                    October 8, 2018

```
 1          Q    Okay.  You did do some recording after the
 2     incident, audio recording?
 3          A    I believe so.
 4          Q    Okay.  Did you have the impression when you
 5     saw the vehicle turning around and you started back
 6     towards your car that the pursuit was going to continue?
 7          A    At that moment, yes.
 8          Q    And did you think in your mind that this
 9     person was still trying to get away?
10          A    At that point, yes.
11          Q    When you first saw the vehicle after you heard
12     the shots; so you hear the shots, you stop, you're kind
13     of in -- in that space between the cars, you look and
14     you see the van emerging from the driver's side of
15     Officer Zeltner's vehicle; is that correct?
16          A    That is correct.
17          Q    Did you shoot initially at that point?
18          A    No.
19          Q    And is one of the reasons you didn't shoot
20     because of some of your training and the policy that we
21     talked about?  At that point you did not see immediate
22     threat of death or serious bodily injury to anyone?
23          A    Correct.
24          Q    When you fired your -- your first shots was
25     two shots; is that correct?
```

47

ZACHERY BRADLEY                                    October 8, 2018

1          A    I believe so.

2          Q    Okay.   And what part of the car were you

3    firing into when you fired those two shots?

4          A    I was aiming at the driver's side window.

5          Q    Okay.   Do you know if the window was up or

6    down?

7          A    I don't recall.

8          Q    And were you aiming at a particular part of

9    the driver?

10         A    I was aiming at the shoulder area of the

11   driver.

12         Q    Okay.   So you would have been to the side of

13   the car -- or to the driver's side of the car when you

14   were firing.

15              Is that fair?

16         MR. FERGUSON:   Objection, vague.

17         THE WITNESS:   I was on the driver's side of the

18   car.

19   BY MR. GALIPO:

20         Q    Okay.   Did you think that the car was about to

21   run you over, for example?

22         A    I did not believe the car was about to run me

23   over.

24         Q    Okay.   Did you know where Officer Zeltner was

25   when you fired your first two shots?

                                                              48

ZACHERY BRADLEY                                    October 8, 2018

```
 1          A    I did not.
 2          Q    How much time would you say passed between
 3   seeing the car after you heard the first group of shots
 4   and you firing your first two shots?
 5          A    Maybe a second.
 6          Q    Okay.  And how much time would you say passed
 7   from your first two shots to your last shot?
 8          A    I couldn't tell you.  Mere seconds.
 9          Q    Did you hear any other shots going off during
10   the time you were shooting?
11          A    No.
12          Q    So you heard the first group of shots?
13          A    Yes.
14          Q    Then you stop and -- and see the vehicle.  You
15   make an assessment at some point.  You fired two shots
16   after about a second.
17               Do I have it right so far?
18          A    Roughly.  It's -- it's an estimation.  From
19   the time of seeing the vehicle emerge past
20   Officer Zeltner's car, I scanned the area and saw that
21   the van was driving directly at Officer Mikowski and
22   Williams and that's when I made the decision to shoot,
23   however long that took.
24          Q    Okay.
25          A    To me it felt like milliseconds.
```

49

ZACHERY BRADLEY                              October 8, 2018

1        Q    Okay.  And then was it also milliseconds

2   between the first two shots and the last shot?

3        A    That one was slightly longer.  That decision

4   was made after the vehicle continued to drive at them,

5   ramming the vehicle.

6        Q    Okay.  So I want to get into the ramming of

7   the vehicle in a -- in a second, but just so I -- I have

8   it clear in my mind, did you fire your last shot before

9   or after the van made contact with the patrol vehicle?

10       A    I fired it -- it's my recollection that the

11  vehicle struck Officer Mikowski's car twice.  I fired it

12  after the first time it rammed it and I heard the engine

13  continue to rev as though it was going to continue to

14  either hit the vehicle or drive over my partners.  So I

15  decided to shoot again.

16       Q    Okay.  When you reviewed your statement

17  recently did you review the transcript?

18       A    I didn't read through all of it.

19       Q    Didn't read through all of it?

20       A    No.

21       Q    Is there any particular reason why not?

22       A    I didn't have time.

23       Q    And when were you first provided with the

24  statement?

25       A    I don't remember.  It's been awhile.

                                                          50

ZACHERY BRADLEY                                    October 8, 2018

```
 1        the incident occurred sometime around 1:00 o'clock in

 2        the morning.

 3               Q   Did you say you were working overtime?

 4               A   Yes.

 5               Q   Do you know what time your shift started that

 6        day?

 7               A   1800.  6:00 p.m. Pacific time.

 8               Q   Now, where were you aiming when you fired your

 9        last shot?

10               A   Towards the head area.

11               Q   Of the driver?

12               A   Of the driver.

13               Q   Okay.  Obviously, based on your training, you

14        were aware that shooting someone with a gun could cause

15        serious injury or death.

16                   Is that fair?

17               A   Yes.

18               Q   And you were aware of that when you fired your

19        shots?

20               A   Yes.

21               Q   You said -- did you say that you observed the

22        van make contact with the officer's vehicle twice?

23               A   Yes.

24               Q   Okay.  And which -- is this Officer Mikowski's

25        vehicle?
```

52

ZACHERY BRADLEY                                    October 8, 2018

```
 1          A    Yes.

 2          Q    Was that the third one in line; in other

 3     words, it was Zeltner, your vehicle and then Mikowski?

 4          A    Correct.  It was the one that I pointed to

 5     that had been pushed back several feet.

 6          Q    Had been pushed back several feet, yes.

 7          A    Yes.

 8          Q    Do you know if there were skid marks on the

 9     ground showing that it had been pushed back several

10     feet?

11          A    I don't recall.  I left the scene before

12     daybreak.

13          Q    Did you ever see any pictures showing skid

14     marks?

15          A    I don't recall.

16          Q    In any event, what part of the van came in

17     contact with what part of Officer Mikowski's vehicle?

18          A    I think the front part of the van contacted

19     the front part of Officer Mikowski's vehicle.

20          Q    Front to front?

21          A    Yes.

22          Q    Okay.  And did it appear that it was pretty

23     much centered to center or did they appear offset?

24          A    I don't recall exactly.

25          Q    Okay.  Do you know -- when you were shooting
```

ZACHERY BRADLEY                                    October 8, 2018

1          at the shoulder area of the driver, how far was the
2          driver from you, approximately?
3               A    Maybe 15, 20 feet.   Length of a vehicle.
4               Q    Okay.  And were you in some type of a shooting
5          stance when you were shooting?
6               A    Yes.
7               Q    Two-handed shooting stance?
8               A    Yes.
9               Q    Do you have an estimate as to the speed of the
10         van when you fired your first two shots?
11              A    I don't.
12              Q    Do you know if it was going more or less than
13         10 miles an hour?
14              A    I don't know for a fact.  I have never been
15         trained in speed estimation.
16              Q    You've been a driver for quite a period of
17         time, I take it?
18              A    Yes.
19              Q    And what would you estimate the speed of the
20         van when you fired your shot to be?
21              A    I don't know.  That would be speculation.
22              Q    I -- I thought you said that the van had
23         already struck the front of the vehicle when you fired
24         the shot to the head?
25              A    I did.

ZACHERY BRADLEY                                    October 8, 2018

```
 1      time?

 2              A    Yes.

 3              Q    You might have known their names, but you

 4      didn't, in glancing to the left, know who was where?

 5                   Is that fair?

 6              A    No, I knew who was where.

 7              Q    You knew who was where?

 8              A    Yes.  Well, except for Sgt. Montez.  I didn't

 9      see him ever.

10              Q    He was probably keeping a low profile.

11              A    I doubt it.

12              Q    Okay.  Have you -- in -- in -- in -- since

13      this incident has happened, have you ever gone back to

14      the scene to do any walk-throughs?

15              A    No.

16              Q    Okay.  So when you glance to your left which

17      officers did you see?

18              A    I saw Officer Mikowski and Officer Williams in

19      between Officer Mikowski's car and the berm.

20              Q    So let's see if I can get a picture to help us

21      out here.

22                   I'm going to pick a couple out and then you

23      let me know if any of them are helpful.

24                   Okay.  Maybe I'm -- let's try 11, but I'm not

25      sure how great it is, but I think I understand what
```

ZACHERY BRADLEY                                    October 8, 2018

1         you're saying.
2                   Does -- does 11 show Officer Mikowski's
3         vehicle?
4              A    Yes, it shows his vehicle after it had been
5         rammed.
6              Q    Would it be fair to say that all of the
7         pictures that show Officer Mikowski's vehicle, if I
8         asked you, you would say it was after it was rammed?
9              A    Yes.
10             Q    Okay.  So you saw these officers on -- would
11        it be the driver's side of Officer Mikowski's vehicle?
12             A    Yes.
13             Q    Okay.  And was the door of Officer Mikowski's
14        vehicle open or closed at that time?
15             A    I don't recall.
16             Q    Were the lights -- the flashing lights of the
17        vehicle on?
18             A    Yes.
19             Q    How about the siren?
20             A    I don't believe so.  When we put our vehicles
21        into park the siren goes off.
22             Q    Okay.  Did you ever observe the -- the
23        vehicle, the van, drive to the -- drive to the driver's
24        side of Officer Mikowski's vehicle?
25             A    I thought that's where the van was going to go

57

ZACHERY BRADLEY                                    October 8, 2018

1       because that was the only place it could have possibly

2       gone to escape.   It was trying to flee.

3              Q    Did it ever go there?

4              A    No, it hit Officer Mikowski's vehicle.

5              Q    And you were estimating -- how far were they

6       from the front of the van when you made this

7       observation?

8              MR. FERGUSON:   Objection, vague.

9              THE WITNESS:   I didn't estimate that.  You didn't

10      ask me that yet.

11      BY MR. GALIPO:

12             Q    I didn't ask you that, but you were asked that

13      in your statement.  I'm just --

14             A    Oh.

15             Q    -- wondering what your estimate would be as to

16      how far they were from the van when you made this

17      observation?

18             A    Maybe -- maybe 30, 40 feet.  I'm not sure.

19             Q    And you don't know what the speed of the

20      vehicle was at that time?

21             A    No.

22             Q    And looking at Exhibit 10, does this show the

23      left front part of Officer Mikowski's vehicle?

24             A    I believe so.

25             Q    Okay.  I'm going to put an "M" there just so

58

ZACHERY BRADLEY                                    October 8, 2018

1          we'll know.
2                    Okay.  So you're saying that the van made
3          impact with the front of Mikowski's vehicle; is that
4          correct?
5              A    Yes.
6              Q    Okay.  And you're also saying that the
7          officers that you saw, the two -- Mikowski and Williams,
8          was it?
9              A    Yes.
10             Q    -- were on the driver's side of Mikowski's
11         vehicle when you glanced to the left?
12             A    Yes.
13             Q    Okay.  Where on the driver's side were they?
14         Were they in the area of the doors of the vehicle?
15             A    Officer Mikowski was more towards the front
16         and Williams was standing back behind him.
17             Q    When you say "more towards the front," you
18         mean on the driver's side, but more a little forward of
19         the door?
20             A    I'm not sure specifically because I don't
21         recall if the door was open or not.
22             Q    And to the left, to the driver's side of their
23         vehicle, wasn't it essentially dirt?
24             A    It was a dirt berm.
25             Q    Showing you Exhibit 5, I think, and correct me

                                                              59

ZACHERY BRADLEY                          October 8, 2018

```
 1        if I'm wrong, we previously indicated that the -- this

 2        was your vehicle where I'm pointing to with my pen.

 3             A    Yes, it appears that's my vehicle.

 4             Q    Okay.  Which was the second vehicle?

 5             A    Yes.

 6             Q    Okay.  I'll circle that.

 7                  And then the vehicle, which is in this

 8        picture, looks like the -- the back hatch is up, that

 9        would be Officer Mikowski's vehicle?

10             A    I believe so, yes.

11             Q    Okay.  And in between the back of your vehicle

12        and the front of Officer Mikowski's vehicle you believe

13        there was room for the car to pass in between?

14             A    At the time, no.

15             Q    No, I'm asking you now.

16             A    Yeah, because the vehicle created space after

17        it collided into his car and pushed it back.

18             Q    And you said it pushed it back 2 feet?

19             A    No, I said several feet.

20             Q    Oh, I thought you said 2 feet.  I may have

21        misunderstood you.

22                  So in looking at this picture now, are you

23        saying there is room -- was -- there is room between the

24        back of your car and the front of Officer Mikowski's car

25        for the vehicle to pass through on the street?
```

60

ZACHERY BRADLEY                           October 8, 2018

```
 1            A    Yes, but this picture was taken after the
 2       shooting had occurred.
 3            Q    I understand.
 4            A    Okay.
 5            Q    Are you aware of any pictures that were taken
 6       before the shooting occurred?
 7            A    No.
 8            Q    So it would be fair to say that all of these
 9       pictures, to your knowledge, were taken afterward?
10            A    Yes.
11            Q    Okay.  Let me show you Exhibit 6.
12                 Does this also show the back of your patrol
13       vehicle?
14            A    Yes, it does.
15            Q    And the front of Mikowski's?
16            A    I believe so, yes.
17            Q    Okay.  I'll put another "M" there.
18                 So the space you're saying, at least as we see
19       it in this picture, that the van could have passed
20       through without going to the driver's side of Mikowski's
21       vehicle would be, essentially, in between the back of
22       your car and the front of Mikowski's vehicle on the
23       street?
24            MR. FERGUSON:   Objection, calls for speculation.
25       Misstates his testimony.   Vague.   Incomplete as framed.
```

61

1    BY MR. GALIPO:

2        Q    You may respond.

3        A    It appears that he may have been able to, yes.

4        Q    What would you estimate, looking at Exhibit 6,

5    the distance between the back of your unit and the front

6    of Mikowski's unit, at least in this picture?

7        A    In this picture, it looks like maybe 12 feet.

8    Maybe.

9        Q    Okay.  And do you have an understanding as to

10   what the width is of a -- the front of a vehicle, about

11   6 feet?

12       A    Give or take, yes.

13       Q    And you're saying that you observed the

14   vehicle make impact with the front of Mikowski's car?

15   You actually saw that?

16       A    Yes.

17       Q    And so it would have been front to front?

18       A    Yes.

19       Q    Okay.  And are you saying that your last shot,

20   the head shot, you fired after that impact?

21       A    In between the first impact and the second

22   impact, yes.

23       Q    But -- okay.  Just wanted to make sure.

24            But after the impact, at least the first

25   impact with Officer Mikowski's vehicle is when you fired

ZACHERY BRADLEY                    October 8, 2018

```
 1      the head shot?
 2           A   Yes.
 3           Q   So when you fired the head shot are you saying
 4      that the front of the van was touching the front of
 5      Mikowski's vehicle?
 6           A   I don't believe so.  I believe that it hit it,
 7      pushed it back and then the engine was accelerating and
 8      getting ready to hit it again.
 9           Q   Where were you positioned -- where were you
10      positioned when you were taking this head shot?
11           A   I was standing in the same place as my first
12      two shots.  The vehicles were that close.  I could see
13      it.  That's how far back it pushed it.  I could see it
14      over my hood.
15           Q   Hold on one second, please.
16               You made an "X" on 12.
17           A   Yes.
18           Q   Is that about where you were when you fired
19      your shots?
20           A   Approximately, yes.
21           Q   And you're saying you were in approximately
22      that same position for not only your first two shots,
23      but your third shot?
24           A   Yes.
25           Q   So you're saying that you took this head shot
```

63

ZACHERY BRADLEY                                    October 8, 2018

1    after the front of the van impacted the front of

2    Mikowski's vehicle from where we see the "X" on

3    Exhibit 12?

4         A   Yes.

5         Q   And what part of the vehicle were you shooting

6    through to get this head shot?

7         A   I wasn't shooting through any part of the

8    vehicle.  I said the impact took place closer to over

9    here and I had a clear vision of the vehicle over my

10   hood.

11        Q   No.  What I'm wondering is, were you shooting

12   through the driver's side window area still --

13        A   Correct.

14        Q   -- for the head shot?

15        A   Yes.

16        Q   And you don't have any estimate as to the

17   speed of the vehicle?  Was it momentarily stopped at

18   that point?

19        A   I don't have an estimate as to the speed of

20   the vehicle.

21        Q   Do you know if it was going more or less than

22   five miles an hour?

23        A   I don't know for sure.

24        Q   Do you know if it was stopped at the moment

25   you took the head shot?

64

1           A    I don't know for sure.

2           Q    And were you in a shooting stance also for the

3      head shot?

4           A    Yes.

5           Q    Before your -- before you took the head

6      shot -- strike that.

7                I know you heard the first group of shots

8      before you fired any shot; is that correct?

9           A    Yes.

10          Q    What I'm wondering is before you took your

11     head shot did you hear any other shots being fired

12     during that time that you were firing?

13          A    I believe they were close to about the same

14     time.

15          Q    As your head shot?

16          A    Yes.

17          Q    Do you know where the officers were at the

18     time you took your head shot in relation to the car?

19          MR. FERGUSON:    Asked and answered.

20          THE WITNESS:    Yeah, Officer Mikowski and

21     Officer Williams were on the driver's side of the

22     vehicle now closer to the vehicle because it had been

23     pushed back.  I still didn't know where Sgt. Montez or

24     Officer Zeltner were.

25     ///

65

ZACHERY BRADLEY                                October 8, 2018

1       BY MR. GALIPO:

2           Q    Okay.  So are you saying that if -- you took

3       your head shot after the front of the van made impact

4       with the front of Officer Mikowski's vehicle.

5               Do I have that correct?

6           A    You do.

7           Q    And you're saying that at about the time you

8       took your head shot, at the same time or soon

9       thereafter, you heard other shots?

10          A    Roughly, yes.

11          Q    Okay.  And did you believe that -- the

12      officers that were shooting were who at that time?

13          A    I didn't know for sure who was shooting.

14          Q    Okay.  Do you have an understanding now as to

15      who was shooting in those last group of shots?

16          A    Yes.

17          Q    What's your understanding?

18          A    Officer Mikowski and Officer Williams.

19          Q    Okay.  And you -- when you saw them, at least

20      during your shooting sequence, they were on the driver's

21      side of Officer Mikowski's car?

22          A    Yes.

23          Q    You just don't remember if the door was open

24      or closed?

25          A    Correct.

ZACHERY BRADLEY                                    October 8, 2018

1        impact?

2              A    I don't recall.

3              Q    When you skimmed through it, did you see any

4        reference to Mikowski's vehicle being pushed back?

5              A    I don't recall.

6              Q    Now, at some point did you see the van going

7        backwards?

8              A    Yes.

9              Q    And where did -- so it just started going

10       backwards at some point?

11             A    Yes.

12             Q    Did you form the impression it was in reverse

13       or neutral at the time?

14             A    That was my belief.

15             Q    Okay.   And when it went backwards did it hit

16       any cars?

17             A    No.

18             Q    So it -- it did not hit your car and did not

19       hit Officer Zeltner's car?

20             A    No.

21             Q    And did it back up to this position that we

22       see in Exhibit 12?

23             A    Yes.

24             Q    And I think there's a few others.   Exhibit 2

25       shows it and Exhibit 10 shows it in its resting position

71

ZACHERY BRADLEY                                    October 8, 2018

1       as well?

2             A    Yes.

3             Q    Exhibit 6 -- it's kind of hard to see, but in

4       the background?

5             A    Yes.

6             Q    How fast was the car going when it reversed?

7             A    Slow.

8             Q    How slow?

9             A    I'm not trained in speed estimation.  I

10      couldn't tell you.

11            Q    Well, you probably have a speedometer on your

12      car.

13            A    Yes.

14            Q    Okay.  I mean, was it less than five miles an

15      hour would you say?

16            A    I can't state for sure.

17            Q    Showing you Exhibit 15, okay, does this also

18      show in the background the -- the van?

19            A    Yes, it does.

20            Q    Would you agree based on your training, under

21      the circumstances of this case, if no officers were

22      about to be struck by the car -- I'm just giving you an

23      hypothetical.

24            A    Okay.

25            Q    Assuming that no officers were about to be

72

ZACHERY BRADLEY                                    October 8, 2018

1         struck by the van, would you agree, based on your

2         training, it would be inappropriate to shoot?

3               MR. FERGUSON:  Objection, incomplete hypothetical.

4         Vague and ambiguous.  Vague.

5               THE WITNESS:  That's not what I believe was going

6         to happen in this incident.

7         BY MR. GALIPO:

8               Q    No, I know that, but, I mean, if you were

9         just -- I just want to assume, hypothetically, that the

10        van was moving in a direction where no officers were

11        about to be struck by it -- I understand you had a

12        different belief -- but just based on your training, if

13        no officers were about to be struck by the van, could

14        you shoot the van just for fleeing?

15              MR. FERGUSON:  Same objections.  Vague and

16        ambiguous.  Incomplete hypothetical as framed.

17              THE WITNESS:  In an incident where a suspect is

18        fleeing and there are no people, officers in danger, it

19        would be inappropriate to shoot.

20                   That is not this incident.

21        BY MR. GALIPO:

22              Q    Okay.  But the danger, as I understand it from

23        your training, has to be an immediate threat of death or

24        serious bodily injury.

25              MR. FERGUSON:  Imminent.

ZACHERY BRADLEY                    October 8, 2018

1          MR. GALIPO:   Pardon?

2          MR. FERGUSON:   Imminent.

3          THE WITNESS:   Reasonable belief.

4     BY MR. GALIPO:

5          Q    Okay.   A reasonable belief of an imminent or

6     immediate threat of death or serious bodily injury.

7          A    Yes.

8          Q    Okay.   When you studied deadly force in the

9     academy and POST Learning Domains, do you remember there

10    being instruction on deadly force?

11         A    Yes.

12         Q    And do you remember that the POST Learning

13    Domains talked about deadly force being a last resort

14    only to be used in the direst of circumstances?

15         A    Something to that effect.

16         Q    Do you remember the learning domain talking

17    about the reverence for human life?

18         A    Yes.

19         Q    Do you remember POST Learning Domains talking

20    about deadly force should only be used when there are no

21    other reasonable alternatives?

22         A    Absolutely.

23         Q    And that's part of your training?

24         A    Yes.

25         Q    Do you remember the POST Learning Domains

ZACHERY BRADLEY                                    October 8, 2018

1    talking about that a verbal warning that you're going to

2    use deadly force should be given when feasible?

3         A   Only when feasible and if there's time.

4         Q   And do you recall in your initial statement

5    you saying that you were pretty sure the driver's side

6    window was down of the van?

7         A   My initial statement to the deputies?  I -- I

8    don't recall.

9         Q   In terms of stepping out of the way of the

10   vehicle rather than shooting, we talked about that;

11   right?

12            Part of the policy to step out of the way --

13   "Officers should move out of the path of an approaching

14   vehicle instead of discharging their firearm at the

15   vehicle or any of its occupants."

16            Do you remember that was one sentence of the

17   policy we talked about?

18        A   Yes, if there's time.  Absolutely.

19        Q   Okay.  And did you have that training with the

20   Murrieta Police Department before the time of this

21   incident?

22        A   Yes.

23        Q   Did you have any understanding as to how long

24   Officer Mikowski had been with the Murrieta Police

25   Department before the date of the incident?

75

ZACHERY BRADLEY                                    October 8, 2018

```
 1              A    I don't recall.

 2              Q    Do you recall that happening at some point

 3      after the incident?

 4              A    I know we said not to talk about it because of

 5      the investigation that was going to be pending.

 6              Q    Okay.  When you say "We said not to talk about

 7      it," would those be the police officers?

 8              A    The police officers and the supervisors, yes.

 9              (Exhibit 19 marked)

10      BY MR. GALIPO:

11              Q    All right.  Exhibit 19, do you know if

12      that's the -- the -- who was driving the car, out of the

13      car in that photo?

14              A    I believe it is probably the driver, but I

15      can't see a face.

16              (Exhibit 20 marked)

17      BY MR. GALIPO:

18              Q    Okay.  Exhibit 20, can you kind of see the

19      face there?

20              A    Yes.

21              Q    Okay.  And is that the driver of the vehicle?

22              A    Yes, it is.

23              Q    Okay.  And do you know when he was -- how was

24      he taken out of the car?

25              A    Through the driver's side door.
```

                                                              79

ZACHERY BRADLEY                    October 8, 2018

1      Q    Do you know who took him out of the car?

2      A    I don't remember, no.

3      Q    Do you know how much time passed from the time

4    of the shooting to the time he was taken out of the car?

5      A    Not specifically.   Maybe a minute or two.

6      Q    One or two minutes would be your estimate?

7      A    Roughly, yes.

8      Q    Do you know if he was still alive at that

9    point?

10     A    I don't know.

11     Q    Okay.  I'm going to go through your statement.

12   I realize you only skimmed through it or breezed through

13   it or something.

14          So there may be a few pauses in my questions

15   and if there's a pause it might be because we've already

16   covered the topic and I don't want to ask again, so just

17   bear with me.  We're almost done.

18     MR. FERGUSON:  Do you have another copy of this?

19     MR. GALIPO:  Not with my underlining, but we can

20   get you a copy if you want.

21          This was exchanged, I believe, in discovery.

22   It has your -- I have your Bates Stamps.

23          Does that help you?

24     MR. FERGUSON:  Yeah.  I just didn't know if you

25   made another copy.  That's all I'm asking you.

80

ZACHERY BRADLEY                                          October 8, 2018

1          Q    Can you turn to Page 17 of 34, please.

2               Investigator Alfaro, on Line 6, is asking you,

3     "So when you saw the vehicle he's accelerating?   It

4     wasn't like it was stopped?"

5               And your response is, "No, he at no point in

6     time that's -- he -- my perception was that it was slow,

7     but I can hear the engine was revving."

8               Do you see that response?

9          A    I do.

10         Q    So when you say it was slow are you referring

11    to the suspect vehicle?

12         A    Yes.

13         Q    Going to Page 20, Lines 2 and 3, you say --

14    well, maybe we should look at the question on the bottom

15    of the prior page.   This is referencing when you're

16    looking over in the direction of the officers.

17         A    Yes.

18         Q    Okay.   And your response at the top of

19    Page 20 is, "Yeah, I didn't -- I didn't recognize them.

20    I just saw officers outside of their car and in the

21    pathway."

22              So do you -- would you agree at the time of

23    your statement you didn't know who the officers were?

24         A    At the time of the statement?   I -- I -- I

25    knew who it was because the incident had occurred.

ZACHERY BRADLEY                                    October 8, 2018

1        Q   Right.  But -- but at the time you looked over

2   would you agree you didn't recognize them?

3        A   That's the statement I gave, yes.

4        Q   Okay.  At the top of Page 21 you say, "So I

5   heard shooting and then my initial thought was guy in

6   the vehicle fleeing.  He can go because generally we

7   don't like to shoot at cars because it can be -- it's

8   known to be ineffective.  So that ..."

9           And then Investor -- Investigator Alfaro says,

10  "I understand that.  So at that point, you actually

11  assessed.  You don't shoot for that specific reason."

12          And then you say, "Yeah."

13          Do you see that part of your statement?

14       A   I do.

15       Q   We kind of talked about that a little bit

16  today earlier?

17       A   Yes.

18       Q   Now, going to Page 22 of your statement,

19  Lines 9 through 12, Alfaro asked you, "Okay --" you can

20  look at 10, actually.  "When the vehicle crashed did you

21  hear more gun fire?"

22          And you said "I don't recall."

23          Do you see that?

24       A   Yes.

25       Q   So would it be correct to say after the

87

ZACHERY BRADLEY                    October 8, 2018

1        BY MR. GALIPO:

2            Q    Did you have a chance to -- to look through

3        some of your statement?

4            A    Yes, I did.

5            Q    Okay.  And would you agree, at least in what

6        you reviewed, you don't see any reference to you firing

7        after the impact between the suspect vehicle and

8        Officer Mikowski's vehicle?

9            A    Correct.

10           Q    And you don't see any reference of there being

11       two impacts to the vehicle.

12               Is that fair?

13           A    Yes.

14           Q    Do you remember drawing a diagram at the time

15       of your initial interview?

16           A    I believe I did.

17           MR. GALIPO:  I think we're good.  So I'll ask you,

18       will you be okay if I don't ask you any more questions?

19           THE WITNESS:  I will be fine.

20           MR. GALIPO:  Pete, do you have any questions today?

21           MR. FERGUSON:  No questions.

22           MR. GALIPO:  I propose that we stipulate to relieve

23       the court reporter of her custodial duties with regards

24       to the original deposition transcript; we'll forward the

25       original to Pete's office, who will make it available

90