# Exhibit 6

```
 1              UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3

 4   NEFTALI MONZON, as Personal    )
     Representative of the          )
 5   Estate of JUNEF RAGADIO        )
     MONZON and individually;       )
 6   MARYLOU MONZON, as Personal    )
     Representative of the          )
 7   Estate of JUNEF RAGADIO        )
     MONZON and individually;       )
 8   JERRICO REYES, an              )
     individual,                    )
 9                                  )
              Plaintiffs,           )
10                                  )
        v.                          )   Case No.
11                                  )   2:17-CV-13712
     CITY OF MURRIETA, a            )
12   governmental entity; SCOTT     )
     MONTEZ, an individual;         )
13   CHRIS ZELTNER, an              )
     individual; KYLE MIKOWSKI,     )
14   an individual; ZACH            )
     BRADLEY, an individual AND     )
15   BLAKE WILLIAMS, an             )
     individual, and DOES 1         )
16   through 10,                    )
                                    )
17            Defendants.           )
     _____)

18

19            DEPOSITION OF BLAKE WILLIAMS

20       WEDNESDAY, OCTOBER 10, 2018, 1:42 P.M.

21               CORONA, CALIFORNIA

22

23      Reported by R. Kelly Jacobson, CSR No. 8361
                  CLS Job No. 90157B

24

25            CENTEXTLEGAL.COM - 855.CENTEXT
```

1

```
 1              UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3

 4  NEFTALI MONZON, as Personal    )
    Representative of the          )
 5  Estate of JUNEF RAGADIO        )
    MONZON and individually;       )
 6  MARYLOU MONZON, as Personal    )
    Representative of the          )
 7  Estate of JUNEF RAGADIO        )
    MONZON and individually;       )
 8  JERRICO REYES, an              )
    individual,                    )
 9                                 )
            Plaintiffs,            )
10                                 )
       vs.                         )  Case No.
11                                 )  2:17-CV-13712
    CITY OF MURRIETA, a            )
12  governmental entity; SCOTT     )
    MONTEZ, an individual;         )
13  CHRIS ZELTNER, an              )
    individual; KYLE MIKOWSKI,     )
14  an individual; ZACH            )
    BRADLEY, an individual AND     )
15  BLAKE WILLIAMS, an             )
    individual, and DOES 1         )
16  through 10,                    )
                                   )
17            Defendants.          )
    _____)

18

19

20

21       DEPOSITION OF BLAKE WILLIAMS, taken at

22  2260 Griffin Way, Corona, California, on Wednesday,

23  October 10, 2018, at 1:42 p.m., before

24  R. Kelly Jacobson, Certified Shorthand Reporter, in and

25  for the State of California.
```

2

```
 1    APPEARANCES:

 2

 3    For Plaintiffs:

 4             LAW OFFICES OF DALE K. GALIPO
               BY:  MARCEL F. SINCICH, ESQ.
 5             21800 Burbank Boulevard, Suite 310
               Woodland Hills, California  91367
 6             818.347.3333
               msincich@galipolaw.com
 7
                       -and-
 8
               THE SEHAT LAW FIRM
 9             BY:  CAMERON SEHAT, ESQ.
               18881 Von Karman Avenue, Suite 850
10             Irvine, California  92612
               949.825.5200
11             cameron@sehatlaw.com

12    For Defendants:

13             FERGUSON, PRAET & SHERMAN
               BY:  ALLEN CHRISTIANSEN, ESQ.
14             1631 East 18th Street
               Santa Ana, California  92705
15             714.953.5300
               achristiansen@law4cops.com
16

17
      Also Present:  Scott Montez
18                    Christopher Zeltner
                      Zachery Bradley
19

20

21

22

23

24

25
```

3

BLAKE WILLIAMS                                    October 10, 2018

1        A    Other than personal reasons, no, it wasn't.

2        Q    Seems like the weather is so nice down there.

3   I don't know how it is in Murrieta, but ...

4             So when did you go to the academy?

5        A    2008.

6        Q    And that was the San Diego academy?

7        A    Yes, it was.

8        Q    How long was that academy?

9        A    Six months.

10       Q    Were you trained on the POST standards at that

11   time?

12       A    Yes.

13       Q    You're familiar with the POST standards?

14       A    Yes.

15       Q    Do you do sustainment training or something to

16   that effect as a police officer?

17       MR. CHRISTIANSEN:   Objection, vague and ambiguous.

18       THE WITNESS:   Sustainment training?   I've never

19   heard it called that.

20   BY MR. SINCICH:

21       Q    Is there anything like a perishable skills

22   training that you have periodic training in?

23       A    Yes.

24       Q    Do you ever, as part of that periodic

25   training, go over the POST standards?

9

BLAKE WILLIAMS                               October 10, 2018

```
 1        A    I believe it's a Sure Fire.
 2        Q    Did you use your weapon at all during the
 3   incident?
 4        A    What weapon?
 5        Q    Your firearm, the Glock.
 6        A    Yes, I did.
 7        Q    How many times did you fire?
 8        A    Ten times.
 9        Q    Were you using your tact light when you were
10   firing your weapon?
11        A    I don't recall.
12        Q    Do you recall using your tact light at all
13   during the incident?
14        A    No.
15        Q    Did you review any documents in preparation
16   for today?
17        A    Yes.
18        Q    What documents did you review?
19        A    The police report which contained my
20   statement.
21        Q    Did you also review the report itself or was
22   it just your statement that you reviewed?
23        A    Just my statement and a few photographs that
24   were attached to it.
25        Q    Were the photographs attached to your
```

15

BLAKE WILLIAMS                                    October 10, 2018

```
 1       A    No.

 2       Q    Who are you with now?

 3       A    Our special enforcement team.

 4       Q    What does the special enforcement team do?

 5       A    Whatever the department needs of us, but

 6  primarily work narcotics, weapons, things of that nature

 7  and it's in an undercover capacity.

 8       Q    Okay.  I was going to ask you is it similar to

 9  the crime suppression team in San Diego, but it seems

10  like it's not because it's undercover.

11       A    Yes.

12       Q    So at some point in time, did you hear a call

13  over the radio that there was a vehicle pursuit in

14  progress?

15       A    Yes.

16       Q    Do you know who made that radio transmission?

17       A    Officer Zeltner.

18       Q    Do you recall what Officer Zeltner said over

19  the radio?

20       A    I believe he asked dispatch first if they had

21  received the hit.

22            Based on my training and experience, I know

23  most of the time that's either he ran somebody with a

24  warrant and got a push back on it or ran a stolen

25  vehicle.
```

21

BLAKE WILLIAMS                                    October 10, 2018

1        Q    And can you describe what a "hit" would be?

2        A    We have a computer system inside our vehicle

3    that allows us to run subjects and vehicles and it comes

4    back through the database, the information, if any.

5        Q    Is it fair to say that a hit is characterizing

6    the search as affirmative; for instance, if you did a

7    search of a warrant that it would have been a violation

8    of the warrant that would be a hit?

9        MR. CHRISTIANSEN:  Objection, vague.  Calls for

10   speculation.

11       THE WITNESS:  Yes, a hit would be a positive hit on

12   that subject or the vehicle that was stolen.

13   BY MR. SINCICH:

14       Q    Okay.  That's what I was trying to get at.

15       A    Yeah.

16       Q    So we're speaking the same language.

17       A    Yeah.

18       Q    After you heard the radio transmission from

19   Officer Zeltner did you immediately join the vehicle

20   pursuit or was there a gap?

21       MR. CHRISTIANSEN:  Objection, vague.  Calls for

22   speculation.

23       THE WITNESS:  I mean, there was a gap.  It wasn't

24   an immediate vehicle pursuit.

25   ///

BLAKE WILLIAMS                                    October 10, 2018

1  BY MR. SINCICH:

2       Q   Were you on a different call at the time?

3       A   I was not.

4       Q   Okay.  Eventually you joined the pursuit?

5       A   I did.

6       Q   Approximately how long did the pursuit last

7  after the time that you joined until its completion?

8       A   I'd say approximately five minutes.

9       Q   Do you recall what vehicle order you were in,

10 what vehicle number you were in, in order of the patrol

11 vehicles during the pursuit?

12      A   Yes, it changed though.

13      Q   What vehicle number in terms of order of

14 patrol vehicles were you by the time the conclusion of

15 the pursuit happened?

16      A   At the conclusion I was No. 4.

17      Q   And which vehicles were 1 through 3, if you

18 recall?

19      A   It was Officer Zeltner, Officer Bradley,

20 Officer Mikowski and me and Sgt. Montez.

21      Q   What street did the officer-involved shooting

22 happen on?

23      A   Mesa Drive.

24      Q   Did you have to turn down Mesa Drive at some

25 point prior to the shooting?

BLAKE WILLIAMS                                          October 10, 2018

1        A    Yes.

2        Q    Okay.  At the time -- I asked that because I'm

3    just trying to give a more specific time frame.

4             At the time that you were turning on

5    Mesa Drive what direction were you turning?

6        A    Southbound.

7        Q    Did you see any of the other patrol vehicles

8    or the suspect vehicle as you were making the turn

9    southbound?

10       A    It was either right at the turn or there

11   shortly after when I had turned onto Mesa Drive.

12       Q    So shortly thereafter when you're on

13   Mesa Drive were you able to see the patrol vehicles?

14       A    Yes.

15       Q    Can you describe to me whether or not they

16   were stopped or if they were still moving at that time?

17       A    They were stopped.

18       Q    At the time that you turned on Mesa Drive --

19   strike that.

20            By the time you first saw all of the other

21   patrol vehicles in front of you, they were all stopped?

22       MR. CHRISTIANSEN:  Asked and answered.

23       THE WITNESS:  I don't recall exactly.  I mean,

24   there were three different vehicles, but my recollection

25   is they were stopped or coming to a stop at the time I

24

BLAKE WILLIAMS                                    October 10, 2018

1   was coming down there.

2   BY MR. SINCICH:

3        Q    Okay.  Were you able to see the suspect

4   vehicle at that point?

5        A    Yes.

6        Q    Where was the suspect vehicle in relation to

7   the patrol vehicles?

8        A    Facing southbound in front of

9   Officer Zeltner's patrol vehicle.

10       Q    Were you able to tell how far

11  Officer Zeltner's vehicle was from the suspect vehicle

12  at that time?

13       A    No.

14       Q    Eventually you came to a stop; correct?

15       A    Yes.

16       Q    And where did you stop your vehicle?

17       A    In the roadway where my vehicle was traveling

18  at the time that the vehicles in front of me had

19  stopped.

20       Q    Where did you stop your vehicle in relation to

21  Officer Mikowski's vehicle?

22       A    Behind him.

23       Q    Do you know how far you were from

24  Officer Mikowski's vehicle when you put your vehicle in

25  park?

BLAKE WILLIAMS                                          October 10, 2018

```
 1        (Telephonic interruption)
 2         MR. CHRISTIANSEN:  Off the record for a second.
 3         MR. SINCICH:  Off the record.
 4        (Discussion off the record)
 5         MR. SINCICH:  Back on the record.
 6    BY MR. SINCICH:
 7         Q   I'm not sure if you answered the previous
 8    question or maybe I just forgot your answer.
 9             How far away from Officer Mikowski's vehicle
10    did you stop your vehicle?
11         A   I don't recall.
12         Q   Can you give me a range in feet?
13         A   I'd say somewhere within 5 feet, roughly.
14         Q   Okay.
15         MR. SINCICH:  I'm just going to grab a photograph
16    Bates numbered 001097.  We're going to mark this as 31.
17             I'm placing it in front of Officer Williams.
18        (Exhibit 31 marked)
19    BY MR. SINCICH:
20         Q   Do you recognize the vehicles in that
21    photograph?
22         A   Yes, I do.
23         Q   Can you identify which vehicle is closest to
24    the person who is taking the picture?
25         A   Appears to be the patrol vehicle that I was
```

26

BLAKE WILLIAMS                                          October 10, 2018

1    driving on the night of the incident or the morning of

2    the incident.

3         Q    And do you know whose vehicle was in front of

4    your vehicle?

5         A    It's Officer Mikowski's.

6         Q    I know that this picture was taken after the

7    incident and the trunk is open on Officer Mikowski's

8    vehicle.

9         Do you know if the trunk was ever opened

10   during the incident?

11        A    I do not believe it was.

12        Q    By the time that you parked your patrol

13   vehicle, before you exited it, were you able to see the

14   suspect vehicle?

15        A    Yes.

16        Q    Where was the suspect vehicle?

17        A    In front of Officer Zeltner's vehicle.

18        Q    And what position was the suspect vehicle in

19   in relation to Officer Zeltner's vehicle?

20        A    It was in front facing southbound when I first

21   saw it.

22        Q    Could you tell whether or not the suspect

23   vehicle had moved from the time that you first saw it

24   after making the turn onto Mesa Drive to the time you

25   stopped your vehicle?

BLAKE WILLIAMS                                    October 10, 2018

1        MR. CHRISTIANSEN:   Objection, vague and ambiguous.

2        THE WITNESS:   During -- somewhere within that time,

3    that short time frame, the vehicle went into reverse.

4    BY MR. SINCICH:

5        Q    Were you able to see it go into reverse?

6        A    Yes, I was.

7        Q    Do you know how far back it went into reverse?

8        A    No.

9        Q    Did you see it stop after it went into

10   reverse?

11       A    It changed direction of travel, went from

12   reverse back to driving forward.

13       Q    Do you know how long that transition took?   I

14   take it you have to stop from going backwards before you

15   go forwards.   Do you know how long that -- that pause

16   was before it went forward?

17       A    Fractions of a second.

18       Q    And this is at the time that you were still in

19   your vehicle?

20       A    Yes.

21       Q    While you were still in your vehicle were you

22   able to see the suspect vehicle move forward then?

23       A    Yes.

24       Q    In which direction did it go forward?

25       MR. CHRISTIANSEN:   Objection, vague as to time.

                                                              28

BLAKE WILLIAMS                                    October 10, 2018

1          THE WITNESS:  It kind of went different directions.

2     It was making a turn.  It appeared as if he was trying

3     to change the direction of his vehicle.

4     BY MR. SINCICH:

5          Q    So previously you said that the suspect

6     vehicle was facing south.

7               Did you see it turning either to the left or

8     the right this first time that you're seeing it moving

9     forward after it had reversed?

10         A    As it went in reverse the vehicle turned and

11    the back end of the vehicle would have been west and the

12    vehicle was facing east in the roadway as it went, but

13    when it accelerated forward, it was turning, but I guess

14    you would say in an eastbound, east, northern direction.

15         Q    Okay.  So the vehicle was facing south and

16    then it -- is it fair to say that it backed up to the

17    right?

18         A    Yes.

19         Q    And do you know if it collided with anything

20    when it backed up to the right?

21         A    I don't recall.

22         Q    After it backed up to the right you're saying

23    it stopped for a split second; is that correct?

24         A    Yes.

25         Q    And at the time that it stopped for that split

BLAKE WILLIAMS                                    October 10, 2018

1  second is it fair to say that it was facing east, the

2  suspect vehicle?

3       A   Yes.

4       Q   Could you tell at that point in time whether

5  or not -- strike that.

6           Could you tell at that point in time how far

7  the suspect vehicle was from Officer Zeltner's vehicle?

8       A   I'd have to say 2 to 5 feet.

9       Q   When you were seeing the vehicle moving

10 forward after it had backed up to right, were you still

11 in your vehicle or at that time were you exiting your

12 vehicle?

13      A   I believe it's about that time that I began to

14 exit the vehicle, at least open the door to my vehicle.

15      Q   Okay.  So were you able to see the suspect

16 vehicle moving forward in any particular direction?  Was

17 it driving directly east or was it going into a

18 different direction?

19      A   While I was getting out of my vehicle I heard

20 a collision.  And the last I saw the vehicle it was

21 coming -- the vehicle was traveling northbound on Mesa.

22      Q   Was it your perception that the collision

23 occurred while the suspect vehicle was moving forward?

24      A   I don't recall.

25      Q   Were you able to see the collision or just

30

BLAKE WILLIAMS                                    October 10, 2018

1   hear it?

2        A   I heard it.

3        Q   Were you able to tell based off of hearing the

4   collision whether or not -- or what the collision was

5   between?

6        A   No.

7        Q   You didn't know if the collision was the

8   suspect vehicle hitting something or something entirely

9   different?

10       A   Correct.

11       Q   Okay.  So at some point you got fully out of

12  your vehicle?

13       A   Yes, sir.

14       Q   Were you able to see the suspect vehicle once

15  you were fully out of your vehicle?

16       MR. CHRISTIANSEN:  Objection, vague as to time.

17       THE WITNESS:  As I was getting out I still had eyes

18  on the suspect vehicle, yes.

19  BY MR. SINCICH:

20       Q   Okay.  And, eventually, you said the suspect

21  vehicle was driving northbound on Mesa Drive?

22       A   Correct.

23       Q   Where were you when you first saw the suspect

24  vehicle driving northbound on Mesa Drive?

25       A   Getting out of my vehicle.

31

BLAKE WILLIAMS                                          October 10, 2018

1      Q    Where was the suspect vehicle when you saw it

2    driving northbound on Mesa Drive when you first saw it?

3      A    Right -- still in front of Officer Zeltner's

4    patrol vehicle right next to it, to the -- on the west

5    curb line of Mesa.

6      Q    I'm trying to visualize what you're saying.

7           So the suspect van was on the west side of

8    Mesa facing north?

9      A    Yes, more or less.  It was a small road so he

10   was further on the -- more or less on the west portion,

11   west side of Mesa Drive.

12     Q    As you looked down the street you're looking

13   south; correct?

14     A    Correct.

15     Q    Was the suspect vehicle -- as it was driving

16   north was it to your left or to your right?

17     A    If I'm looking at the suspect vehicle, the

18   suspect vehicle is to my right.

19     Q    And you could see the suspect vehicle's

20   headlights at that time?

21     A    Yes.

22     Q    And where was the suspect vehicle in relation

23   to Officer Zeltner's vehicle?

24     A    If it wasn't hitting it, it was right there

25   next to it.

32

BLAKE WILLIAMS                                          October 10, 2018

1        Q    Would you say it was perfectly parallel to

2   Officer Zeltner's vehicle or were they at a different

3   angle when --

4        MR. CHRISTIANSEN:   Objection --

5   BY MR. SINCICH:

6        Q    -- you first saw it going northbound?

7        MR. CHRISTIANSEN:   Objection, misstates his

8   testimony.

9             You can answer.

10       THE WITNESS:   I don't know if they were parallel,

11  but the vehicle -- I mean, obviously, it was

12  accelerating forward.  So at different times it was at

13  different parts of his vehicle.  But, yes, I would say,

14  more or less, parallel with it, driving past it.

15  BY MR. SINCICH:

16       Q    Okay.   So you saw the suspect vehicle driving

17  northbound?

18       A    Correct.

19       Q    And then what did you do?

20       A    As I -- again, it happened quick.   This is

21  about the time I'm stopping, opening up my door and

22  getting out.   As I'm exiting my vehicle is when I hear

23  gunshots and I don't know where the gunshots are coming

24  from, if it's the suspect shooting or -- or my partner

25  shooting, but I hear the volley of six to eight

BLAKE WILLIAMS                                    October 10, 2018

1    gunshots.

2         Q    Was that just one volley of gunshots or could

3    it have been two volleys?

4         A    My recollection is one.

5         Q    Was there any pause in that volley of gunshots

6    at all?

7         A    Not a substantial pause that I recollect.

8         Q    Was it your impression off of hearing that

9    volley of gunshots that they were all coming from one

10   individual?

11        A    I can't say.

12        Q    Okay.  Were you able to see the suspect

13   vehicle at the time that you heard the gunshots?

14        A    At that time, I -- I don't recall.  I don't

15   think so because while I was getting out I think it was

16   possibly blocked by Officer Mikowski's vehicle.

17        Q    Did you hear any officers giving any commands

18   prior to hearing that volley of gunshots?

19        A    I heard a lot of like yelling, so I assume

20   they were commands.  I do not know exactly what those

21   commands were, but I did hear yelling in front of me.

22        Q    Did you hear more than one person yelling?

23        A    Yes.

24        Q    Were they yelling loud?

25        A    Yes, loud enough for me to hear it.

BLAKE WILLIAMS                                           October 10, 2018

1      Q   Was it your impression that the multiple

2 people yelling were officers?

3      MR. CHRISTIANSEN:   Objection, calls for

4 speculation.

5      THE WITNESS:   I -- I believed it to be --

6 BY MR. SINCICH:

7      Q   But you --

8      A   Officers.

9      Q   I'm sorry.   But you couldn't tell what they

10 were saying?

11     A   No.

12     Q   So after you heard the gunshots what did you

13 do?

14     A   At that time I saw Officer Mikowski getting

15 his canine out of the vehicle and going towards the

16 front driver's side quarter panel area of his vehicle

17 and I went to his location.

18     Q   Were you moving from your vehicle up to

19 Officer Mikowski's vehicle when you saw Officer Mikowski

20 getting his dog out?

21     A   Yes.

22     Q   Do you know where Officer Mikowski keeps his

23 dog in the vehicle?

24     A   Yes.

25     Q   Where is that?

35

BLAKE WILLIAMS                                              October 10, 2018

1        A    It's in the back seat, not the very back, but

2    the -- I guess you could say -- it's a Tahoe, so the

3    middle section.

4        Q    And that's on the driver's side?

5        A    You can get either -- you can get there either

6    way, but he was taking his canine out of the driver's

7    side of the vehicle.

8        Q    So I take it the rear driver's side door was

9    open at the time?

10       A    Again, he was taking it -- him out.  It was

11   shortly thereafter that he moved to the front of his

12   car.  I wasn't even up with him yet.  So I don't know if

13   I saw it opened or closed.  I just could see him

14   handling his canine.

15       Q    How would you describe that he was handling

16   the canine?

17       A    I recall he was holding him by the collar and

18   he did not have the leash on yet.

19       Q    Do you know if Officer Mikowski's driver's

20   door was open?

21       MR. CHRISTIANSEN:  Objection, vague as to time.

22       THE WITNESS:  I don't recall.

23   BY MR. SINCICH:

24       Q    At the time that you saw Officer Mikowski move

25   from taking his dog out of the vehicle to the front left

BLAKE WILLIAMS                                    October 10, 2018

1    quarter panel of his vehicle could you tell at that time

2    whether or not any of the doors on the driver's side of

3    Officer Mikowski's car were open?

4         A    I don't recall.

5         Q    As you were moving from your vehicle up to

6    Officer Mikowski's position were you able to see the

7    suspect vehicle?

8         A    No.

9         Q    When was the next time -- what position --

10   strike that.

11        What position were you in the next time that

12   you were able to see the suspect vehicle?

13        A    Officer Mikowski's vehicle was struck, which

14   caused his vehicle to move.  The vehicle with --

15   Officer Mikowski's vehicle was knocked into me and my

16   right arm went through the rear, back driver's side

17   window of the vehicle.

18        At that time, it kind of pushed me out to the

19   side and I continued forward.  And it's at that point

20   where I saw the suspect vehicle and -- at the front of

21   Officer Mikowski's vehicle.

22        Q    Okay.  Do you know what area of the window

23   your arm hit on Officer Mikowski's rear window?

24        MR. CHRISTIANSEN:  Objection, asked and answered.

25        THE WITNESS:  Do I know what window or where

37

BLAKE WILLIAMS                                      October 10, 2018

1   exactly on the window?

2   BY MR. SINCICH:

3        Q    What area of the window?  Not exactly.  Just

4   what area?

5        A    I have no idea.

6        Q    Not bottom, top, left, right portion,

7   somewhere in the middle?

8        MR. CHRISTIANSEN:  Objection, asked and answered.

9        THE WITNESS:  I don't know.  I'd have to say

10  probably the lower portion based on my height and the

11  height of the window.

12  BY MR. SINCICH:

13       Q    Could you approximate how high the window is,

14  the bottom portion of the window off of the ground?

15       MR. CHRISTIANSEN:  Objection, relevance.  Calls for

16  speculation.

17       THE WITNESS:  I'd say approximately 3 feet off the

18  ground.

19  BY MR. SINCICH:

20       Q    If you were standing up next to the window

21  where would you say it approximately was in relation to

22  your body?

23       A    Say, right about my rib cage, like my nipple

24  line.

25       Q    The bottom of the window?

38

BLAKE WILLIAMS                              October 10, 2018

1    A    Yeah, that's what I'd say.

2    Q    Are you right-handed or left-handed?

3    A    I'm right-handed.

4    Q    At the time you were moving up to

5  Officer Mikowski's vehicle did you have your gun drawn?

6    A    Yes.

7    Q    What part of your body, if you know,

8  specifically, hit the window?

9       MR. CHRISTIANSEN:   I'll object.   Misstates his

10  prior testimony.

11      THE WITNESS:   I believe it would be my elbow/arm

12  area, lower arm area.

13  BY MR. SINCICH:

14   Q    Do you know if your weapon struck the window

15  at all?

16   A    It did not.

17   Q    As you were moving from your vehicle up to

18  Officer Mikowski's vehicle before the impact with your

19  arm, did you have your weapon pointed in any particular

20  direction?

21      MR. CHRISTIANSEN:   Vague as to time.

22      THE WITNESS:   I had my firearm as I was running up,

23  considered the low ready position.   I had my hands on

24  the gun.   They weren't fully extended out in front of

25  me.   I had my elbows kind of tucked into my body as I

39

BLAKE WILLIAMS                                    October 10, 2018

1    was running with my -- the barrel of my gun kind of

2    pointed to the ground.

3    BY MR. SINCICH:

4        Q   Is it fair to say that your arms were at about

5    a 90-degree angle at that time?

6        A   Yes.

7        Q   And your weapon was maybe 6, 10 inches away

8    from your chest?

9        A   Yes.

10       Q   And was your weapon about nipple or chest

11   high?

12       A   Yes.

13       Q   Prior to that happening, did you see the

14   suspect vehicle just prior to -- moments prior to the

15   impact of -- of your body on Officer Mikowski's vehicle

16   did you see the suspect vehicle?

17       A   I could see headlights, but not distinctively

18   because Officer Mikowski's vehicle was in front of me

19   and the suspect vehicle at that point.

20       Q   Were you able to see the suspect vehicle --

21   strike that.

22           As you were running up to Officer Mikowski's

23   vehicle did you know what the suspect vehicle was doing?

24       MR. CHRISTIANSEN:  Objection, calls for

25   speculation.  Vague as to time.

BLAKE WILLIAMS                                    October 10, 2018

1          THE WITNESS:   I believe it was traveling forward

2     because based on the prior movements of it and I could

3     hear the acceleration of the vehicle.

4     BY MR. SINCICH:

5          Q    So it was your belief that the suspect vehicle

6     was driving northbound on Mesa Drive?

7          A    Yes.

8          Q    And then after the impact between the suspect

9     vehicle and Officer Mikowski's vehicle, that was about

10    the time that your arm impacted Officer Mikowski's

11    vehicle?

12         MR. CHRISTIANSEN:   Objection, misstates the prior

13    testimony.

14              I think he said the vehicle impacted his arm;

15    right?

16         THE WITNESS:   Correct.   My -- after the vehicle --

17    the suspect vehicle collided with Officer Mikowski's

18    vehicle, Officer Mikowski's vehicle then was hit back.

19    And while the vehicle moved -- Officer Mikowski's

20    vehicle moved, it hit -- it like hit my arm.

21    BY MR. SINCICH:

22         Q    Okay.   Were you able to see the impact of the

23    van and Officer Mikowski's vehicle?

24         A    No, I heard it and felt it.

25         Q    Okay.   How far were you from

BLAKE WILLIAMS                                October 10, 2018

1    Officer Mikowski's vehicle when you heard the impact?

2         A    I'd say I was going alongside of it.   Within

3    2 feet of it.

4         Q    Would that be 2 feet behind the vehicle?

5         A    I was on the side of it, probably 2 feet away

6    from the side of his vehicle.

7         Q    So you were 2 feet to the left of the vehicle

8    or 2 feet behind the vehicle?

9         A    I would say 2 feet left of the vehicle.

10   Again, I was running, so ...

11        Q    Right.   So at the moment of impact would you

12   say that you were right about where the window was, but

13   2 feet to the left of the vehicle?

14        A    I'd say I might have been slightly back,

15   closer to towards the back bumper.

16        Q    Okay.   At that point in time, did you hear any

17   other volleys of shots?

18        A    No.

19        Q    Did you hear any other commands after the

20   first volley of shots that you described up until that

21   point that you heard the impact?

22        A    Any more commands?

23        Q    Yes.

24        A    I don't recall.   I remember hearing commands

25   and people yelling pretty much the entire incident.

                                                           42

BLAKE WILLIAMS                                    October 10, 2018

```
 1       Q   How many people do you think were yelling?
 2       MR. CHRISTIANSEN:  Objection, calls for
 3  speculation.
 4       THE WITNESS:  I don't know.
 5       MR. CHRISTIANSEN:  Vague as to time.
 6       THE WITNESS:  I don't know.
 7  BY MR. SINCICH:
 8       Q   Were you giving commands at all during the
 9  incident?
10       A   The entire incident or at this point of the
11  incident?
12       Q   We'll narrow it down to -- to the point of
13  prior to the impact of the van and Officer Mikowski's
14  vehicle.
15       A   I gave no statements -- or no commands.
16       Q   And then after Officer Mikowski's vehicle --
17  at some point in time after Officer Mikowski's vehicle
18  you fired your firearm?
19       A   Yes.
20       Q   Approximately how long was it from the time
21  you heard the impact of the van onto Officer Mikowski's
22  vehicle till the time you fired your first shot?
23       A   I'd say three seconds to five seconds, just a
24  few seconds.
25       Q   Did you give any commands in that
```

BLAKE WILLIAMS                                    October 10, 2018

1    three-to-five second time frame?

2         A    At that point I believe so.

3         Q    What commands did you give?

4         A    I believe just "Stop the vehicle.   Show us

5    your hands."   The typical.   I don't recall, though.

6         Q    Do you recall how many commands you gave?

7         A    No.

8         Q    Where were you when you were giving those

9    commands in relation to Officer Mikowski's vehicle?

10        A    His front left quarter panel.

11        Q    Where was Officer Mikowski at the time?

12        A    To my left.

13        Q    I'm just trying to get a visual of -- of where

14   you were.

15             How far were you from Officer Mikowski's

16   vehicle?

17        A    I'd say I was at the front left quarter panel

18   kind of near the hood area, front bumper.   I was

19   approximately 2 to 5 feet to the left of his vehicle and

20   he was standing to the left of me.

21             I -- I'd say maybe closer to like 2 feet from

22   his vehicle, to the left of it.

23        Q    Was he in between you and the vehicle --

24        A    No --

25        Q    -- Officer Mikowski?

44

BLAKE WILLIAMS                                    October 10, 2018

1          A    -- he was to my left.

2          Q    Okay.  I don't know if I misheard you.

3               I think you said that you were close to 5 feet

4     away from Officer Mikowski's vehicle.

5          A    No, I -- I -- I misspoke.  I -- I think then

6     corrected myself and said about probably 2 feet from --

7          Q    Okay.

8          A    -- the front left quarter panel/hood area of

9     his vehicle.

10         Q    Would you say you were up more forward of his

11    tire or behind his tire?

12         A    I'd say probably just right in that area.

13         Q    Okay.  And about 2 feet away from the front

14    left quarter panel of Officer Mikowski's vehicle was

15    your position?

16         A    Correct.

17         Q    And you described Officer Mikowski then being

18    2 feet to your left?

19         A    No, he was like right to my left.  We were

20    really close to one another.

21         Q    Were you shoulder to shoulder or was he

22    somewhat behind you or in front of you?

23         A    I would say we were pretty much shoulder to

24    shoulder.

25         Q    Did he have his canine at the time?

BLAKE WILLIAMS                    October 10, 2018

1      A    He did.

2      Q    Do you know if his gun was drawn at the time?

3      A    I believe it was.

4      Q    Do you know if his canine was with him, was he

5   in physical control of his canine is what I'm getting

6   at?

7      A    Yes, he was.

8      Q    Okay.  Do you know if he was giving any

9   commands at the time you were giving commands?

10     A    I do recall him yelling.  I don't know what he

11  was saying, but I -- I just remember yelling.

12     Q    Do you recall -- at that period of time where

13  you and Officer Mikowski are in the position of the

14  front left quarter panel of Officer Mikowski's vehicle,

15  do you recall where Officer Zeltner or Officer Bradley

16  were?

17     A    No, I had no visual of them.

18     Q    Was there something hindering your visual of

19  where they were?

20     A    The suspect vehicle.

21     Q    Did you know where their vehicles were at the

22  time?

23          MR. CHRISTIANSEN:  Objection, vague as to time.

24  Ambiguous.

25          THE WITNESS:  I suspected they were still where

46

1   they were at when I pulled up to the scene.

2   BY MR. SINCICH:

3       Q    Okay.  Were you able to see -- strike that.  I

4   want to show proper respect.

5            Were you able to see Sgt. Montez at the time?

6       A    No.

7       Q    Did you have any idea where Sgt. Montez was?

8       A    No.

9       Q    I just want to back up a little bit.  When you

10  got out of your vehicle was it before or after

11  Sgt. Montez got out?

12      A    I believe it was at the same time.  Maybe a

13  little after because I was putting the car in park and

14  doing all that as I was getting out, but I would say

15  it's pretty simultaneous.

16      Q    Did you have any idea where Sgt. Montez went?

17      A    No.

18      Q    Did you hear Sgt. Montez giving any commands

19  prior to you firing your weapon?

20      A    I don't recall.

21      MR. CHRISTIANSEN:  Is this a good time for a break?

22      MR. SINCICH:  What time did we get started?  It was

23  1:30?

24      THE REPORTER:  It was 1:42.

25      MR. CHRISTIANSEN:  Almost an hour ago.

47

BLAKE WILLIAMS                                      October 10, 2018

```
 1        MR. SINCICH:  Was there a question pending?  I'm
 2   sorry.
 3      (record read)
 4        MR. SINCICH:  I just wanted to make sure he
 5   answered the question.
 6        THE REPORTER:  Yes, he did.
 7        MR. SINCICH:  Okay.  Let's go on a 10-minute break.
 8           Is that good with you, Counsel?
 9        MR. CHRISTIANSEN:  Sure.
10        MR. SINCICH:  All right.  Great.  Off the record.
11      (Recess)
12        MR. SINCICH:  Let's go back on the record.
13   BY MR. SINCICH:
14        Q   Officer Williams, at the time that you and
15   Officer Mikowski were at the front left quarter panel of
16   Officer Mikowski's vehicle, how long prior to that did
17   you hear the collision between the suspect vehicle and
18   Officer Mikowski's vehicle?
19        MR. CHRISTIANSEN:  Objection, vague and ambiguous.
20   Vague as to time.  Unintelligible.
21           If you understand.
22        THE WITNESS:  Right when I got to the front of his
23   vehicle?
24   BY MR. SINCICH:
25        Q   Yes.
```

BLAKE WILLIAMS                                    October 10, 2018

1        A    I would say seconds, two to three seconds.

2        Q    Okay.  Did you hear any gunfire outside of the

3  first volley that you described earlier in that two- to

4  three-second time frame?

5        A    No.

6        Q    Once you got to the position with

7  Officer Mikowski to your left were you standing on dirt

8  or on the concrete?

9        A    Dirt.

10       MR. CHRISTIANSEN:  Go ahead.

11       THE WITNESS:  Dirt.

12  BY MR. SINCICH:

13       Q    Do you know if there was anything behind you?

14       A    A fence.

15       Q    Was the fence directly behind you?

16       A    It was to my left.  I don't know how many

17  feet.  I would say 2 to 3 feet to -- to our left or east

18  of us.

19       Q    Okay.  Were you able to see Mr. Monzon at that

20  time?

21       A    Yes.

22       Q    Was his vehicle still moving?

23       A    Yes, it was accelerating forward.

24       Q    How fast was he moving?

25       A    Momentum-wise he was not going too fast

49

BLAKE WILLIAMS                                              October 10, 2018

1   ambiguous as to "forward."

2        THE WITNESS:  I don't recall.  I mean, he was in a

3   turning motion, so, I mean, the vehicle moved probably

4   approximately 5 feet or so.

5   BY MR. SINCICH:

6        Q    Was it still attached to Officer Mikowski's

7   vehicle as it moved approximately 5 feet?

8        MR. CHRISTIANSEN:  Objection, vague as to the term

9   "attached."

10           You can answer.

11       THE WITNESS:  I don't know.  My focus wasn't on the

12  front, like the front bumper.  I was looking to see what

13  Monzon's actions were because at that time even though

14  he crashed into Officer Mikowski's vehicle causing it to

15  hit me and the first volley of gunshots, I did not know

16  if those came from him, so my focus was on Mr. Monzon.

17  BY MR. SINCICH:

18       Q    When you first saw Mr. Monzon himself, not the

19  suspect vehicle, but Mr. Monzon himself, was that prior

20  to you shooting?

21       MR. CHRISTIANSEN:  Objection, vague as to time.

22       THE WITNESS:  Yes.

23  BY MR. SINCICH:

24       Q    Were you looking at him through a window?

25       MR. CHRISTIANSEN:  Same objection, vague as to

                                                              51

BLAKE WILLIAMS                                    October 10, 2018

1   time.

2        THE WITNESS:   I had a visual of him through the

3   front windshield.

4   BY MR. SINCICH:

5        Q    Were you able to see his hands at that time?

6        A    I believe his hands were on the steering wheel

7   at that time.

8        Q    Did you know where on the steering wheel they

9   were?

10       A    I don't recall.

11       Q    How long did it take for you to fire the

12  10 rounds?

13       A    How long did it take to shoot in concession

14  the whole 10 rounds to be shot or how long did it take

15  until I fired like -- started firing?

16       Q    The -- the 10 rounds.  From starting to fire

17  to the last round, Round 1 to Round 10, how long was

18  that?

19       A    I'd would say three to five seconds.  Five

20  seconds, maybe.  Maybe less.

21       Q    Did you hear any officer give a deadly force

22  warning before you shot your rounds?

23       MR. CHRISTIANSEN:  Objection, vague as to time.

24  Calls for speculation.

25       THE WITNESS:  Again, I don't recall.  I heard

52

BLAKE WILLIAMS                                    October 10, 2018

1    yelling and screaming.  Whether it was a deadly force

2    notification, I don't -- I've never heard -- I don't

3    really know what that is.  But, no, I don't know what

4    people were saying.

5    BY MR. SINCICH:

6         Q    Were you ever trained to give a warning, if

7    feasible, before using deadly force?

8         A    Yes, if feasible.

9         Q    Right.  So when I say "a deadly force

10   warning," that's what I'm referring to.  A warning

11   given, if feasible, prior to using deadly force.

12        Do you understand that?

13        A    Yes.

14        Q    Did you hear any -- strike that.

15        Did you give any warning that you were going

16   to use deadly force prior to using deadly force?

17        A    No.

18        Q    Were you trained that you can only use deadly

19   force if it's an immediate defense of life situation?

20        MR. CHRISTIANSEN:  Objection, misstates the policy.

21   Vague and ambiguous.  Incomplete hypothetical.

22        THE WITNESS:  I have the understanding that I'm

23   able to use deadly force if there's an imminent threat

24   to human life and if there's the threat of death or

25   injury.

1    BY MR. SINCICH:

2         Q    Is that serious bodily injury?

3         A    Yes.

4         Q    Were you trained that you should only use

5    deadly force in the direst of circumstances?

6         MR. CHRISTIANSEN:   Objection, misstates the policy.

7    Vague and ambiguous.   Incomplete hypothetical.

8         THE WITNESS:   I believe that was kind of answered

9    in the last question that I could use deadly force if

10   life is in jeopardy of death or great bodily injury then

11   I may use deadly force.

12   BY MR. SINCICH:

13        Q    Right.   And I understand that.   What I'm

14   asking is not specifically with regard to the policy,

15   but in your training up until the point of the incident,

16   were you ever trained that deadly force should ever

17   be only used in the direst of circumstances?

18        MR. CHRISTIANSEN:   Objection, asked and answered.

19   Incomplete hypothetical.

20        THE WITNESS:   I don't really understand what you're

21   saying with dire -- I guess direst, if -- you know, if

22   it's a situation where my life, my partner's life or

23   somebody else's life is in danger or there's the threat

24   of great bodily injury, then, yes, I can use deadly

25   force.

54

BLAKE WILLIAMS                                    October 10, 2018

1    BY MR. SINCICH:

2         Q    Were you trained that you should only use

3    deadly force as a last resort?

4         MR. CHRISTIANSEN:   Objection, incomplete

5    hypothetical.   It calls for speculation.

6         THE WITNESS:   Restate that question.

7    BY MR. SINCICH:

8         Q    Were you trained, based on your policies or

9    any of the training that you had as a police officer,

10   that you should only use deadly force as a last resort?

11        MR. CHRISTIANSEN:   Same objection.   Incomplete

12   hypothetical.   Calls for speculation.   Misstates the

13   policy.

14        THE WITNESS:   No.

15   BY MR. SINCICH:

16        Q    Is it consistent with your training that you

17   should only use deadly force if there are no other

18   reasonable alternatives?

19        MR. CHRISTIANSEN:   Objection, incomplete

20   hypothetical.   Misstates the policy.   It calls for

21   speculation.

22        THE WITNESS:   Can you ask that again?

23   BY MR. SINCICH:

24        Q    Were you trained that you should only deadly

25   force if there are no other reasonable alternatives?

55

BLAKE WILLIAMS                                          October 10, 2018

1        MR. CHRISTIANSEN:   Same objection.   Incomplete

2   hypothetical.   It calls for speculation.

3        THE WITNESS:   Yes.

4   BY MR. SINCICH:

5        Q    What was the -- what was the suspect vehicle

6   doing during the three to five seconds that you were

7   firing?

8        A    Driving toward Officer Mikowski and myself.

9        Q    Did you stay in the same place as you were

10  firing all of your shots?

11       A    Yes.

12       Q    Were you ever trained that you can shoot and

13  move?

14       MR. CHRISTIANSEN:   Objection, incomplete

15  hypothetical.

16       THE WITNESS:   Yes, if I'm able to.

17  BY MR. SINCICH:

18       Q    Were you ever trained that when you're

19  conducting a felony stop after a vehicle pursuit that

20  you should give room for the suspect vehicle to flee?

21       MR. CHRISTIANSEN:   Objection, incomplete

22  hypothetical.  Calls for speculation.  Lacks foundation.

23       THE WITNESS:   I mean, a felony stop you're stopped

24  behind the vehicle, obviously, we're not going to set up

25  a cross-fire situation where people park in front of it,

56

BLAKE WILLIAMS                                    October 10, 2018

1   so there's always an avenue of escape because they can

2   proceed forward.

3   BY MR. SINCICH:

4       Q   Did you feel that in the position that you

5   parked your vehicle that the suspect had enough room if

6   he chose to flee to pass you?

7       MR. CHRISTIANSEN:   Objection, incomplete

8   hypothetical.   Calls for speculation.

9       THE WITNESS:   Absolutely.

10  BY MR. SINCICH:

11      Q   Do you feel like -- based on your perspective

12  of where Officer Mikowski parked, was there enough room

13  for the suspect vehicle to flee past Officer Mikowski's

14  vehicle?

15      MR. CHRISTIANSEN:   Objection, incomplete

16  hypothetical.   It calls for speculation.

17      THE WITNESS:   That's kind of the same question,

18  isn't it?

19  BY MR. SINCICH:

20      Q   Well, no, the first question I was asking

21  about your vehicle.

22      A   My vehicle?

23      Q   The first question I asked about your vehicle

24  and this time I'm asking about Officer Mikowski's

25  vehicle.

57

BLAKE WILLIAMS                                    October 10, 2018

1        MR. CHRISTIANSEN:   And I'm making the same
2    objection, incomplete hypothetical.
3        THE WITNESS:   Yes.
4        MR. CHRISTIANSEN:   It calls for speculation.
5        THE WITNESS:   The vehicle, where all police
6    vehicles were parked, had more than enough room to leave
7    or evade or get out of the area he was in if he needed
8    to.
9        MR. SINCICH:   I'm going to mark this photograph as
10   32.
11           I'm handing it to Officer Williams.
12       (Exhibit 32 marked)
13   BY MR. SINCICH:
14       Q   Do you recognize the vehicles in that
15   photograph?
16       A   Yes.
17       Q   Which vehicle is directly to the right on the
18   right-hand side of this photograph?
19       A   Where you can only see the front portion of
20   it?
21       Q   Yes, there's like half of a tire showing.
22       A   That would be Officer Mikowski's vehicle.
23       Q   And in front of that vehicle, the first full
24   vehicle that you can see, whose vehicle is that?
25       A   Officer Bradley.

58

BLAKE WILLIAMS                                                          October 10, 2018

1      Q    And in front of Officer Bradley's vehicle?

2      A    Officer Zeltner.

3      Q    And is that the suspect van in the -- the

4    small vehicle that's down at the end of the street?

5      A    Yes.

6      Q    The perspective of this photograph, is this

7    about the perspective that you had from your position as

8    you were firing your rounds at Mr. Monzon?

9      A    I believe so.

10      Q    Did you know that there was officer vehicles

11    in your backdrop at the time that you fired your rounds?

12      A    They're not from this angle.  Yes, they were

13    in my backdrop.

14      Q    Did you know that at the time?

15      A    Yes.

16      Q    Did you know there was a house in your

17    backdrop at the time you fired your rounds?

18          MR. CHRISTIANSEN:  I'll object.  It's vague and

19    ambiguous.  Misleading.

20          THE WITNESS:  There was not a house in my backdrop.

21    BY MR. SINICICH:

22      Q    So your direction of fire from where you were

23    standing to Mr. Monzon, would that have been to the left

24    or to the right of the suspect vehicle, your direction

25    of fire?

                                                                              59

BLAKE WILLIAMS                                    October 10, 2018

1    quarter panel on the driver's side, which is the area I

2    was standing in.

3    BY MR. SINCICH:

4        Q    Okay.  Were you standing on relatively flat

5    ground right there?

6        A    No.

7        Q    It appears that the embankment is on a slight

8    incline; right?

9        A    Correct.

10       Q    How far up the incline were you from where the

11   concrete is to the fence?

12       A    I don't recall.  I would say maybe half --

13   halfway in between Officer Mikowski's vehicle and the

14   fence.

15       Q    Was Officer Mikowski closer to the fence than

16   you?

17       MR. CHRISTIANSEN:  Objection, asked and answered.

18       THE WITNESS:  I don't recall.  I know -- I mean, he

19   was to my left, so I would -- I would assume so, but I

20   don't recall.

21   BY MR. SINCICH:

22       Q    You mentioned that the van was moving while

23   you were shooting; is that right?

24       A    Moving forward.

25       Q    Was it moving the entire time that you were

BLAKE WILLIAMS                                    October 10, 2018

1    BY MR. SINCICH:

2        Q    What occurred to give you the impression that

3    the threat was no longer present?

4        A    Mr. Monzon was no longer accelerating his

5    vehicle into the path of me and Officer Mikowski.

6        Q    Is it fair to say that that's because he

7    stopped the vehicle?

8        A    Yes.

9        Q    How many more shots did you fire from the time

10   he stopped the vehicle until you stopped firing?

11       MR. CHRISTIANSEN:   Objection, vague and ambiguous.

12   Misstates prior testimony.   Unintelligible.

13       THE WITNESS:   Again, I -- I believe I answered that

14   already.   It was almost simultaneous.   It happened

15   within probably three to five seconds of -- were the

16   rounds and I was firing and when I noticed that his

17   vehicle is no longer accelerating towards me and moving

18   towards me and the engine stopped revving that's what

19   time I fired -- or stopped firing my -- my firearm.

20   BY MR. SINCICH:

21       Q    Where were you aiming on Mr. Monzon?

22       A    His chest.

23       Q    Could you clearly see his chest?

24       A    Yes.

25       Q    Were you using your tact light at that time?

63

BLAKE WILLIAMS                                            October 10, 2018

1        A    I don't believe I was.

2        Q    What was the approximate distance between you

3   and Mr. Monzon as you were firing?

4        MR. CHRISTIANSEN:   Objection, asked and answered.

5        THE WITNESS:   Ten to 15 feet.

6   BY MR. SINCICH:

7        Q    Was anybody else firing at the same time that

8   you were firing?

9        MR. CHRISTIANSEN:   Objection, calls for

10  speculation.

11       THE WITNESS:   I know Officer Mikowski was because

12  he was to my left.

13  BY MR. SINCICH:

14       Q    Do you recall how many rounds he fired?

15       A    I do not.

16       Q    Do you know if any of the other officers that

17  were on scene were firing at the same time?

18       A    Do I know now or did I know at that time?

19       Q    Did you know at that time?

20       A    No.

21       Q    What is your understanding as to who was

22  firing at the same time that you were firing?

23       MR. CHRISTIANSEN:   I'll object that if you learned

24  any of this information he's asking for, if it came from

25  your attorneys, I'm going to instruct you not to answer.

BLAKE WILLIAMS                                    October 10, 2018

1          THE WITNESS:  I mean, the night of the incident and

2    all of the people involved and knowing where everybody's

3    location was, I assumed Officer -- or Sgt. Montez was

4    firing at the same time as me and Officer Mikowski.

5    BY MR. SINCICH:

6          Q    You don't know where Officer -- excuse me --

7    did you know where Sgt. Montez was when you were firing?

8          A    No.

9          Q    Did you come to know after the incident, prior

10   to giving your statement, outside of the communication

11   with your attorney, where Officer Montez was when he was

12   firing?

13         A    Yes.

14         Q    How did you come to know that?

15         A    When we were doing our -- the safety debrief

16   seeing where everybody, you know, was standing, the

17   direction that the rounds were going, we were all kind

18   of -- you know, where was everybody standing kind of

19   thing, so that's when I discovered where he was

20   standing.

21         Q    Sgt. Montez told you?

22         A    I don't recall who told me or -- I -- I

23   believe it was him.

24         Q    And where did you learn that he was standing?

25         A    To the right of Officer Mikowski's vehicle.  I

BLAKE WILLIAMS                                    October 10, 2018

```
 1   don't know exactly where, but I know he was to the right

 2   of Officer Mikowski's vehicle at the time of the

 3   shooting.

 4        Q   At the time you were shooting were -- were you

 5   still looking at Mr. Montez (sic)?

 6        A   Say that again.

 7        Q   At the time you were shooting -- excuse me, I

 8   said "Montez."  Excuse me.  No offense, Sergeant.

 9            At the time you were shooting at Mr. Monzon

10   were you still looking at Mr. Monzon?

11        A   Yes.

12        Q   Could you see his body moving at all as you

13   were firing?

14        A    Not other than just controlling the car kind

15   of.  I mean, he was just seated in the front driver's

16   seat of the vehicle.

17            And then after the -- after I fired my rounds

18   I noticed he kind of -- like his body kind of slumped a

19   little bit, like not slumped over, but you could just

20   tell his body ...

21        Q   Did you get the impression as you were

22   shooting that your bullets were impacting where you were

23   aiming?

24        MR. CHRISTIANSEN:   Objection, calls for

25   speculation.
```

                                                            66

BLAKE WILLIAMS                                    October 10, 2018

1          THE WITNESS:  I -- I believe so, but I -- I don't

2     know.

3     BY MR. SINCICH:

4          Q    So after you stopped firing was anybody else

5     firing or were you the last person to fire?

6          MR. CHRISTIANSEN:  Objection, calls for

7     speculation.

8          THE WITNESS:  Again, I don't know.  It was such a

9     quick time.  I heard the volley.  Once I stopped firing

10    I don't recall hearing anything after, but I -- I -- I

11    don't recall.

12    BY MR. SINCICH:

13         Q    Okay.  And then you -- you stated that he

14    slumped over after the firing ceased?

15         MR. CHRISTIANSEN:  Objection, misstates the prior

16    testimony.

17         THE WITNESS:  Yeah.  I said his body kind of

18    slumped.  He did not like slump over.  It wasn't like --

19    his body didn't like fold over.  It's just like almost

20    like relaxed almost.

21    BY MR. SINCICH:

22         Q    Like his shoulders dropped?

23         A    More or less, yes.

24         Q    Did he lean in any direction forward, to the

25    left or to the right?

1      A   I don't recall.  I think, if anything,

2  possibly a little to his left, but he was still upright

3  in the seated position with his head facing forward.

4      Q   Right.  At that point in time when you saw

5  Mr. Monzon kind of slumped over, as you described, did

6  you have the impression as to whether or not he was

7  alive?

8      MR. CHRISTIANSEN:  Objection, calls for

9  speculation.  Seeks the opinion of an expert.

10     THE WITNESS:  I -- I -- I cannot tell you.  I don't

11  know.

12  BY MR. SINCICH:

13     Q   Right.  I'm just trying to -- trying to gather

14  what your impression was at the time.

15         What were the thoughts that were going through

16  your mind?

17     MR. CHRISTIANSEN:  Objection, overbroad.  Vague and

18  ambiguous.  Calls for speculation.

19     THE WITNESS:  I mean, based on the totality of the

20  circumstances with his body dropping and then at that

21  point the vehicle began rolling backwards, my belief was

22  he was at least injured.

23         Again, I don't know if he was dead.  I wasn't

24  able to take his pulse at that time and kind of tell if

25  he was breathing.  I don't have that information.

BLAKE WILLIAMS                                          October 10, 2018

1    BY MR. SINCICH:

2         Q    Right.  On Exhibit 32 in front of you, do you

3    see that line that appears to be going down the road

4    from Officer Mikowski's vehicle in the direction of the

5    van?

6         A    Yes.

7         Q    Do you have any information as to what that

8    is?

9         A    I can speculate, but, no, I don't know what

10   that is.

11        Q    Did you watch the van roll from its position

12   while you were firing into its resting position as you

13   can see in Exhibit 32?

14        MR. CHRISTIANSEN:  Objection, misstates prior

15   testimony.  Asked and answered.

16        THE WITNESS:  I didn't -- I wasn't firing at the

17   vehicle when it was rolling backwards.

18   BY MR. SINCICH:

19        Q    Right.  My question is, did you see the

20   suspect van roll from the position that it was when you

21   fired all the way to the position that it is in its

22   resting position as shown in Exhibit 32?

23        A    Yes.

24        Q    And what were you doing as it was rolling

25   backwards?

BLAKE WILLIAMS                                    October 10, 2018

1         A    I kept my gun pointed at the vehicle, at

2    Mr. Monzon.  Again, not knowing if he was the one that

3    fired the earlier rounds and if a threat was going to

4    present itself, aiming my firearm at Mr. Monzon as I

5    moved forward towards the vehicle.

6         Q    What was your direction of travel as you moved

7    forward towards the vehicle?

8         A    I went from the position that you see here in

9    Exhibit 32 and I ended up -- when I stopped I was on the

10   driver's side of the suspect vehicle.  So I was south --

11   you know, mainly south, but I went a little west, I

12   guess you would say, because I went to the driver's

13   side.

14        Q    Is it fair to say you essentially followed the

15   path from this perspective just straight over towards

16   the tree that's to the right of the vehicle?

17        A    Yes.

18        Q    Okay.  Do you know how fast the suspect

19   vehicle was rolling backwards?

20        A    It was literally just rolling backwards as --

21   it sounded as if the gear shift or something went -- you

22   know, was hit or the vehicle was not fully in gear

23   because there was like a clicking sound as the vehicle

24   was rolling backwards.

25        Q    Did you ever see Mr. Monzon after the time

70

1       Q    Were you able to tell if the vehicle was in

2   drive at the time that it came to rest?

3       A    Again, my belief was it was knocked out of

4   gear or in between gears because it was rolling

5   backwards and a clicking sound.

6       Q    Right.  What did you do once you got down to

7   the end of the cul-de-sac, as you described, on the

8   driver's side of the suspect vehicle?

9       A    I believe at that time -- I don't know our

10  positioning, but I believe Officer Mikowski,

11  Sgt. Montez, myself, Officer Bradley and Officer Zeltner

12  were all in that general area giving commands to show us

13  his hands and, you know, again, I don't know what

14  everybody else was saying, but I know there was a few of

15  us talking, "Give us your hands" or "Show us your

16  hands."

17            And then Officer Mikowski gave announcements

18  and eventually sent his canine towards the vehicle.

19      Q    Did you see what the canine did as it went

20  towards the vehicle?

21      A    Yes, it went through the driver's side window

22  and began to bite Mr. Monzon.  I don't know exactly

23  where -- where he was on the bite because it's kind of

24  small and the dog's -- canine is moving around a lot,

25  but I did notice that he was on or was biting

72

BLAKE WILLIAMS                                          October 10, 2018

1    Mr. Monzon.

2         Q    Eventually I understand that Mr. Monzon was

3    given medical aid; is that right?

4         A    Yes.

5         Q    How long was it from the time that you first

6    saw the dog biting Mr. Monzon to the time that medical

7    aid started?

8         A    From the time he was -- the canine was biting

9    to the time medical aid was provided, I would say was

10   within like two minutes -- a minute, a minute or two.

11        Q    Okay.  Eventually the dog released the bite?

12        A    Officer Mikowski retrieved his dog off the

13   bite, yes.

14        Q    What did you do after Officer Mikowski

15   retrieved his dog?

16        A    I don't know at -- at what point

17   Officer Mikowski -- or that his canine released from the

18   bite, but I know about that time when Officer -- or

19   Officer Mikowski and Sgt. Montez were at the passenger

20   side of the vehicle retrieving the canine, it was

21   mentioned that there was somebody else in the vehicle,

22   that there was a passenger in the back of the vehicle,

23   at which time, even standing right there, I was unable

24   to see into the vehicle.

25             I could not see anybody.  So I opened the

BLAKE WILLIAMS                                    October 10, 2018

 1     slider door.  Guessing it was unlocked, I was able to

 2     open it and there was a male sitting, kind of like

 3     laying to the side in the captain's chair behind the

 4     driver's seat.

 5          Q    Which side was the person leaning?

 6          A    To the right.

 7          Q    Was that to his right?

 8          A    Yes.

 9          Q    So as he's sitting in the captain's chair he

10     would be leaning towards the center of the vehicle?

11          A    Yes.

12          Q    At the time that you were shooting could you

13     see clearly into the vehicle?

14          A    I could see clearly into the vehicle and had a

15     clear view of Mr. Monzon.

16          Q    Was the person that you found in the captain's

17     seat, was that person in the seat just behind

18     Mr. Monzon's seat?

19          A    Yes.

20          Q    At the time that you were shooting at

21     Mr. Monzon did you know there was another person in the

22     back seat?

23          A    No.

24          Q    Did you check to see if there was any person

25     in the back seat?

BLAKE WILLIAMS                                              October 10, 2018

1          MR. CHRISTIANSEN:   Objection, vague as to time.

2    BY MR. SINCICH:

3          Q    At the time you were shooting.

4          A    No.

5          MR. CHRISTIANSEN:   Assumes facts.

6    BY MR. SINCICH:

7          Q    Were you trained that when you're shooting at

8    a vehicle -- at the driver of a vehicle that you should

9    consider whether or not there are people, other

10   passengers in the vehicle?

11         MR. CHRISTIANSEN:   Objection, assumes facts.

12   Misstates the policy.   Incomplete hypothetical.   It

13   calls for speculation.

14         THE WITNESS:   I mean, yeah, you want to make sure

15   you're not going to endanger anybody else, but, again, I

16   had a clear view into the window and I did not see any

17   other occupants inside that vehicle at that time.

18   BY MR. SINCICH:

19         Q    So you opened the sliding door where Mr. Reyes

20   was sitting; correct?

21         A    Yes.

22         Q    Did you pull Mr. Reyes out or did another

23   officer do that?

24         A    I did.

25         Q    What did you do with Mr. Reyes at that time?

BLAKE WILLIAMS                                    October 10, 2018

1        A    I assisted him to the ground, not knowing,

2   again -- there were gunshots earlier, we still didn't

3   know where those came from.   I patted him down for

4   weapons.   I -- I believe I detained him in handcuffs.   I

5   believe I handcuffed him.

6             Patted him down, asked him if he was injured.

7   Kind of scanned him to see if he had any injuries or any

8   gunshots on him.

9        Q    Did you find any injuries or gunshots on him?

10       A    I believe I remember him having a cut on his

11  head or there was some blood on -- on his forehead, I

12  believe.

13            And, possibly, I think he had an injury to one

14  of his hands, but at that time I was looking more for

15  like -- like gunshot wounds, life-threatening injuries,

16  that if he needed treatment that I could perform for

17  him.

18            But at that time, I didn't see any type of

19  serious bodily injury, so I passed him off -- I asked

20  Officer Bradley to take him away from the vehicle

21  because the vehicle was still not secured.   Told him to

22  take custody of Mr. Reyes and do a more thorough -- you

23  know, provide medical aid if he needed it or, you know,

24  talk with him, secure him.

25       Q    Did you come to find out later on from a

BLAKE WILLIAMS                                    October 10, 2018

1   source other than your attorneys that Mr. Monzon (sic)

2   was shot in the hand?

3        A    There was mention that it was a possibility,

4   but it was never confirmed.

5        Q    When was that mentioned?

6        A    I don't recall.  I believe it was some time --

7   I mean, hours after, after Mr. Reyes was treated at the

8   hospital.

9        Q    And how did you come to learn that

10  information?

11       A    What information?

12       Q    That it was a possibility that Mr. Reyes was

13  shot in the hand?

14       A    Sometime that morning after the incident.

15       Q    Right.  How did you come to learn that

16  information?

17       A    I -- I don't recall.  I don't know if it's the

18  officer that was there at the hospital with him or I

19  don't recall who told me or how I found out.

20       Q    Would it have been through a phone call or

21  radio transmission?

22       MR. CHRISTIANSEN:  Objection, asked and answered.

23       THE WITNESS:  I don't recall.

24  BY MR. SINICICH:

25       Q    Okay.  After you passed off Mr. Reyes to

BLAKE WILLIAMS                                    October 10, 2018

1    Officer Bradley then what did you do?

2        A    Then Sgt. Montez stated -- or told me to take

3    Mr. Monzon out of the vehicle and check him out, provide

4    medical aid if he needed it.

5        Q    Did you do that?

6        A    Yes.

7        Q    How did you take Mr. Monzon out of the

8    vehicle?

9        A    I grabbed him by his upper body, his shoulder

10   area, and assisted him out of the car and laid him on

11   his back on the road near -- right outside of his

12   vehicle.

13       Q    What did you do after you laid him on his

14   back?

15       A    Assessed him.  Saw the gunshot wounds and

16   checked for a pulse.

17       Q    Did you find a pulse at that time?

18       A    I did not.

19       Q    Did you find any gunshot wounds at that time?

20       A    I saw gunshot wounds to his right side, but I

21   didn't -- I don't know how many.

22       Q    And what type of medical aid did you render

23   considering that you couldn't find a pulse and that he

24   had gunshot wounds?

25       A    Again, I saw he wasn't breathing and minus the

BLAKE WILLIAMS                                    October 10, 2018

1    pulse as well, I began CPR.

2         Q    I understand that CPR is kind of a two-part

3    process.   What -- is that your understanding as well?

4         A    Yes.

5         Q    There's chest compressions as one component

6    and then assisted breathing as the second component?

7         A    Yes.

8         Q    Is there any other component that you're

9    familiar with to CPR?

10        A    No.

11        Q    Okay.   Which one of those were you doing,

12   if -- or both, if that's the case?

13        A    Chest compressions.   I -- I began CPR and went

14   through -- I don't know how many cycles, you know, of

15   chest compressions.   I did it for a short time.

16             My gloves that I had on were ripped and I had

17   blood on my hands, so at which time I believe it was

18   Officer Devey, D-e-v-e-y -- Officer Devey was -- arrived

19   on scene and was there.   So I asked him to continue CPR

20   for me since I -- so I didn't continue getting blood all

21   over my hands.

22        Q    Did you see Officer Embrey arrive on scene at

23   all?

24        A    I did.

25        Q    Did they arrive, meaning Officer Devey and

BLAKE WILLIAMS                                      October 10, 2018

1  Officer Embrey, about the same time?

2      A   I don't know what time they arrived.  At -- at

3  the time I saw -- personally, I saw Officer Devey first.

4  I didn't see Officer Embrey until a little after.

5      Q   Okay.  I just didn't know if --

6      A   If they're the same person?

7      Q   Right.  Almost seems like a similar name.

8      A   Yeah.

9      Q   So I didn't want to -- I wanted to make sure

10  it was clear.

11      A   Right.

12      Q   Is it consistent with your training that an

13  officer should move out of the way instead of shooting

14  at a moving vehicle, if possible?

15      MR. CHRISTIANSEN:  Objection, incomplete

16  hypothetical.  It calls for speculation.

17      THE WITNESS:  Yes, if it's possible and there's an

18  avenue for us to escape from and -- or to get to a place

19  of safety, yes.

20  BY MR. SINCICH:

21      Q   Is it consistent with your training that an

22  officer shouldn't put himself in a position that's in

23  the path of a moving vehicle?

24      MR. CHRISTIANSEN:  Objection, incomplete

25  hypothetical.

BLAKE WILLIAMS                                          October 10, 2018

1        THE WITNESS:  Yes.  I mean, I think that's just

2    common sense that you're not going to want to put

3    yourself in front of a moving vehicle.

4    BY MR. SINCICH:

5        Q   So would you agree that if you knew a vehicle

6    was moving in a particular direction, it would be

7    counter to your training to move into the same

8    direction -- or rather in the opposite direction that

9    that vehicle is moving?

10       MR. CHRISTIANSEN:  Objection, incomplete

11   hypothetical.  Assumes facts.  Calls for speculation.

12       THE WITNESS:  I believe you misspoke.  You would

13   want to go to the opposite direction that the vehicle is

14   going.

15   BY MR. SINCICH:

16       Q   So, for instance, in this case, if a suspect

17   vehicle was moving northbound --

18       A   Uh-huh.

19       Q   -- is it consistent with your training for the

20   officer to move southbound?

21       MR. CHRISTIANSEN:  Objection, it's an incomplete

22   hypothetical.  It calls for speculation.

23       THE WITNESS:  I mean, to go southbound straight

24   towards the path of the vehicle, yeah, but if you were

25   going southbound to the east of where the vehicle was

BLAKE WILLIAMS                                    October 10, 2018

1    speculation.

2         THE WITNESS:  I don't know.

3    BY MR. SINCICH:

4         Q    Okay.  How long after you started CPR did

5    medical aid arrive?

6         A    I'd say a -- a few minutes.  I would say no

7    longer than five minutes.  Somewhere within there.

8    Three minutes.

9         Q    Did you call for medical aid?

10        A    No.

11        Q    Are you aware if medical aid was called for?

12        A    I -- I believe it was because paramedics

13   showed up on scene.

14        Q    All right.  Do you know who called them?

15        A    I do not.

16        Q    Was Mr. Monzon being given CPR the entire time

17   before the medics showed up?

18        A    Yes.

19        Q    Was it both chest compressions and assisted

20   breathing?

21        A    I know at the time I was giving him CPR, I

22   gave him just chest compressions because I don't have a

23   pocket mask on me at the time.  They're normally in our

24   vehicles.

25             When I passed Mr. Monzon to Officer Devey I

                                                        84

BLAKE WILLIAMS                                    October 10, 2018

1    recall him doing chest compressions.  I don't know if

2    any other officer brought a face mask and began doing --

3    what would it be -- ventilation for him.

4         Q   Are the officer vehicles equipped with some

5    form of first aid bag?

6         MR. CHRISTIANSEN:  Objection, it calls for

7    speculation as to any other vehicle but his own.

8         THE WITNESS:  Officer vehicles aren't, but we are

9    issued just little masks that you put over the -- their

10   mouth and nose and you blow into.

11   BY MR. SINCICH:

12        Q   Okay.  Did you have a mask in your vehicle

13   that could have been used for CPR?

14        A   Yes.

15        Q   Did you tell anybody that you had a mask in

16   that vehicle?

17        MR. CHRISTIANSEN:  Objection, relevance.

18        THE WITNESS:  I mean, at that time, no, because I

19   was giving Mr. Monzon chest compressions.

20   BY MR. SINCICH:

21        Q   Did you see anybody else grab a pocket mask in

22   order to give Mr. Monzon ventilations while you were

23   doing the chest compressions?

24        MR. CHRISTIANSEN:  Objection, asked and answered.

25   It calls for speculation.

85

BLAKE WILLIAMS                                    October 10, 2018

1          THE WITNESS:  Yeah, I already answered that.
2          ==I -- I know I did chest compressions.==  ==No one==
3  ==was giving him mouth to mouth at that time.==
4          When Officer Devey took over, I did not
5  witness him do mouth to mouth or have a mask with him,
6  but, again, after that I left the area to go clean up
7  because I had lacerations on my arm.
8  BY MR. SINCICH:
9      Q   Where were the lacerations on your arm?
10     A   Right arm.
11     Q   Where on the right arm were the lacerations?
12     A   My forearm.
13     Q   Was it close to your elbow or your wrist?
14     A   I could show you if you want to see all my
15  scars.
16     Q   Well, that would be difficult to -- to put
17  that on the record in terms of a description.  So if you
18  recall where they are --
19     MR. CHRISTIANSEN:  I don't think it would be.  We
20  could look at --
21     THE WITNESS:  I mean, I don't -- yeah.  I mean, if
22  you want see so you can put -- I mean, they're on my
23  forearm.  They're all right here on different areas of
24  my arm.
25  ///

BLAKE WILLIAMS                                      October 10, 2018

```
 1    transcript of your voluntary statement that's Bates
 2    numbered 000217 to 000242.
 3           And I'll let you know which page and line
 4    number that I'm referring to.  I just want to ask you a
 5    couple of questions about the statement.
 6        A   Okay.
 7        Q   I believe you -- you mentioned that you gave
 8    the statement at -- I think you said exactly 11:57;
 9    right?
10        A   I did.
11        Q   So that would be roughly 10 hours after the
12    incident, something like that?
13        A   Yes.  Sorry.
14        Q   Is it fair to say that the statements that you
15    gave in your voluntary statement were fresher in your
16    memory than they are today?
17        A   Yes.
18        Q   And of the numerous times that you reviewed
19    your statement did you find anything that you felt was
20    incorrect or wrong?
21        A   Not that I saw.
22        Q   Okay.  I want to refer you to Page 9 of 26.
23        A   Okay.
24        Q   Start at Line 7 at the sentence that begins on
25    Line 7.  And it's kind of a long sentence, so I'll break
```

                                                                 88

BLAKE WILLIAMS                                October 10, 2018

```
 1    it up to the end of Line 11 where the comma is.

 2            If you could just read that to yourself.

 3        A   You said all the way -- oh, that whole

 4    sentence from --

 5        Q   No, just Line 7 to 11 because it's a pretty --

 6    it's two sentences, but the second one is pretty long.

 7        A   Okay.

 8        Q   Did you get a chance to read it?

 9        A   Yes, I did.

10        Q   Okay.  So for context, at this portion of your

11    statement, is this where you're describing the

12    placement -- that you begin by describing the placement

13    of the officer vehicles in front of where you parked?

14        A   Yes.

15        Q   And then did you go on to describe what the

16    suspect vehicle was doing?

17        A   Yes.

18        Q   Is it fair to say that in accordance with your

19    statement that prior to you getting out of the car it

20    was your impression that the vehicle was turning to come

21    in a northbound direction?

22        MR. CHRISTIANSEN:   It calls for speculation.

23        THE WITNESS:   At the time that I was getting out of

24    my vehicle or that I was in my vehicle at the time where

25    I'm talking about that you had me look over just now, I
```

BLAKE WILLIAMS                                              October 10, 2018

 1    believe I'd say that he was seen reversing going

 2    backwards quickly and attempting to make what I thought

 3    was going to be a two-point turn.

 4    BY MR. SINICH:

 5         Q   Right.  And it was in accordance with your

 6    statement, your impression that the vehicle was going

 7    to -- in completion of that two-point turn come in a

 8    northbound direction?

 9         MR. CHRISTIANSEN:  Objection, misstates prior

10    testimony.  It calls for speculation.  The record speaks

11    for itself.  Misstates the record.

12         THE WITNESS:  Yeah.  I mean, that's a possibility

13    of what could happen, but based on the totality of

14    everything and the type of erratic driving he was doing

15    the entire pursuit and the things he did, I had no clue

16    what he was going to do, if he was going to drive

17    through the fence or I couldn't tell you.

18    BY MR. SINICH:

19         Q   Okay.  So on Line 10 about halfway through

20    there's a comma, and then that portion of the sentence

21    goes to Line 11, about halfway in that line to the other

22    comma.

23             You see that?

24         A   Yes.

25         Q   Isn't it fair to say that in your mind, your

90

```
 1          So I believe I gave this statement and said

 2    that he was trying to turn around and go the other way

 3    because I know at the end that's what he ended up doing.

 4    BY MR. SINCICH:

 5          Q    Was it difficult for you to see

 6    Officer Mikowski when you first got out of your vehicle?

 7          A    Not really.  When I actually looked over to

 8    the driver's side of his door when I started to go over

 9    to his vehicle, I mean, I saw him.  He wasn't concealed

10    or hiding anywhere.  He was -- he was on the driver's

11    side of his vehicle.

12          Q    After the van collided with Officer Mikowski's

13    vehicle was it difficult for you to see Officer Zeltner

14    and Officer Bradley?

15          MR. CHRISTIANSEN:  Objection, asked and answered.

16          THE WITNESS:  I believe I already answered that.

17              At no time prior to or during the shooting did

18    I see Officer Bradley or Officer Zeltner.

19    BY MR. SINCICH:

20          Q    Was that in part because there was flashing

21    lights on the patrol vehicles?

22          MR. CHRISTIANSEN:  Objection, misstates prior

23    testimony.  Asked and answered.

24          THE WITNESS:  I couldn't tell you why I couldn't

25    see them.  I don't know if it's positioning.  It was
```

92

BLAKE WILLIAMS                                    October 10, 2018

1    dark outside.   There are flashing lights, so it does

2    make it difficult to see, but, yeah, I don't know.   I

3    just don't know where they were standing.   I didn't see

4    them.

5    BY MR. SINCICH:

6         Q    How do the flashing lights make it difficult

7    to see?

8         MR. CHRISTIANSEN:   Objection, calls for

9    speculation.   Seeks the opinion of an expert.   It lacks

10   relevance.

11        THE WITNESS:   Because it's dark outside and those

12   are -- well, I don't know on Officer Zeltner's, but I

13   know Officer Bradley's and my vehicle, they're LED

14   lights, so they're extremely bright and they're flashing

15   lights, so ...

16   BY MR. SINCICH:

17        Q    Which lights are you referring to that are

18   flashing?

19        A    The overhead lights.

20        Q    Do you know what color lights are flashing at

21   the time that you're describing?

22        A    Blue, red and I believe white or clear.

23   White.

24        Q    When you described that Officer Mikowski's

25   vehicle impacted your arm, did you get knocked down at

93

BLAKE WILLIAMS                                      October 10, 2018

1    all?

2          A    No.

3          Q    Do you remember saying that you got knocked

4    down in your statement?

5          A    No.  Because I didn't say that in my

6    statement.

7          Q    Did you stumble at all or anything like that?

8          A    I mean, the inertia of the vehicle, the -- I

9    don't even know.  I'm not good with vehicles, but a

10   2,000 pound vehicle or something hitting me, yeah, I

11   moved.

12         Q    Do you recall in your statement describing

13   that the suspect vehicle's tires were spinning out?

14         A    Yes.

15         Q    Did you see them spin out or did you hear them

16   spin out?

17         A    Hear them.

18         Q    And when you say spinning out what does that

19   mean to you?

20         A    I believe what you're referring to when I'm

21   describing it, the -- the engine's revving, so I know

22   the vehicle is in drive or, you know, being accelerated

23   and I could hear tires slipping on gravel or you could

24   hear the sound of the tires spinning.

25              I mean, I don't know how -- it wasn't like a

94

BLAKE WILLIAMS                                    October 10, 2018

1   ==like screeching, but you could hear the tires spinning==

2   ==on like loose gravel kind of.==

3        Q   Is that spinning out that you're describing

4   the tires spinning without the vehicle moving forward?

5        A   No, I believe I -- I already testified earlier

6   while that was happening the vehicle -- I don't know if

7   it was on Officer Mikowski's vehicle or kind of like

8   turning off of it, but the vehicle was constantly moving

9   forward.

10       Q   Okay.  If I can direct you to Page 10.

11           Are you there already?

12       A   Uh-huh.

13       Q   I thought I had a second.

14           Lines 22 to 23.  Is the situation that you're

15   describing in that sentence once the suspect vehicle

16   came to a stop at the end of the cul-de-sac?

17       A   No.

18       Q   Where was the suspect vehicle when you were

19   describing the subject matter of that sentence?

20       A   That was when the vehicle is accelerating

21   forward towards me and Officer Mikowski and prior to me

22   shooting.

23       Q   If I can have you look back --

24       MR. SINCICH:  Is that the statement on the screen,

25   Counsel?

1       MR. CHRISTIANSEN:  I don't know.  Probably.

2           Why don't you just read --

3       MR. SINCICH:  Back a couple lines, I think.

4       MR. CHRISTIANSEN:  You can read the whole thing if

5   you want to.  Take your time.

6       THE WITNESS:  Oh, okay.  Yeah, sorry about that.

7   Yeah, that's going to be when it rolled back.

8   BY MR. SINCICH:

9       Q   Okay.  So is it fair to say that as you were

10  approaching the suspect vehicle it was your belief that

11  Mr. Monzon was still breathing?

12      A   No.  That's what I did, I misread it.  The

13  first time I thought it said it "could," but if you read

14  it, it says "couldn't see."

15      Q   What couldn't you see?

16      A   I couldn't see if he was still -- I couldn't

17  tell, I guess you would say.  But in here it says

18  "couldn't see," but I couldn't tell if he was still

19  breathing and I couldn't see his hands.

20      Q   Is your memory as it is today of the incident

21  that as you approached the suspect vehicle your belief

22  is that he was not breathing?

23      MR. CHRISTIANSEN:  Objection, misstates his

24  testimony.

25      THE WITNESS:  Again, I said I -- I couldn't see.  I

96

BLAKE WILLIAMS                                    October 10, 2018

1    the page.  And if I can turn your attention to Lines 21

2    through 23.

3              Do you remember making that statement --

4    saying these words in your voluntary statement?

5         A    Yes.

6         Q    Is it fair to say that you were running up

7    towards the position of the front left fender of

8    Officer Mikowski's vehicle when you saw the suspect

9    vehicle driving north?

10        A    As the vehicle was driving northbound I -- I

11   ran towards the driver's side of Officer Mikowski's

12   vehicle.

13        Q    You described some injuries on your arm and

14   I'm wondering if this was what I call a Freudian slip.

15             If you look at the same page, Line 30.

16        A    Uh-huh.

17        Q    Do you recall telling the investigator that

18   your left arm went through the window?

19        MR. CHRISTIANSEN:  Well, I'll object that the

20   sentence is a little out of context.

21             Misstates the document.  The document speaks

22   for itself.

23             You can answer.

24        THE WITNESS:  Yeah, I -- when giving my statement,

25   I -- I probably accidentally said my left arm and he

99

BLAKE WILLIAMS                                    October 10, 2018

1    quickly asked my right arm and I corrected myself and

2    said, "Yes, my right arm."

3    BY MR. SINCICH:

4        Q    That's what I was wondering, if that was a

5    mistake when you -- when you first said "left arm."

6        A    Yes.  And that's why I said further down, when

7    you see three lines down I say my right arm.

8        Q    Yeah, I see that.

9        A    Yeah.

10       Q    If you can turn to Page 19.  The question

11   starts on Line 23.  And your final answer to two of

12   those questions ends on Line 30.

13            What are you describing there?

14       A    That I did not try to shoot the vehicle to

15   disable it.

16       Q    Why didn't you try to shoot the vehicle to

17   disable it?

18       MR. CHRISTIANSEN:  Objection, the document speaks

19   for itself.  Asked and answered.

20       THE WITNESS:  Because I have a small caliber weapon

21   and it's not likely that I am going to stop the vehicle

22   or disable the vehicle with a round.

23   BY MR. SINCICH:

24       Q    Was it your opinion at the time that it would

25   have no effect on the vehicle?

100

BLAKE WILLIAMS                                          October 10, 2018

1      MR. CHRISTIANSEN:   Objection, misstates his

2   testimony.

3      THE WITNESS:   There's a good possibility that it

4   would have no effect.

5      MR. SINCICH:   I don't have much more.   Thank you

6   for bearing with me.

7          I'm just reviewing some of the notes that I

8   made.   Sorry for the pause.

9      THE WITNESS:   No worries.

10  BY MR. SINCICH:

11     Q   Do you remember stating that Mr. Reyes --

12  strike that.

13         I believe you were referring to Mr. Monzon was

14  bleeding profusely.

15     A   Yes.

16     Q   When were you able to tell that he was

17  bleeding profusely?

18     A   When I took him out of the vehicle.

19     Q   Were you able to see any blood as the vehicle

20  was rolling backwards?

21     A   I don't recall.   I don't believe so.

22     Q   Do you recall what color shirt Mr. Monzon was

23  wearing?

24     A   White.

25     Q   Can I turn your attention to Page 24, Lines 26

101

BLAKE WILLIAMS                                    October 10, 2018

1    to 28.

2             Did you get a chance to read it?

3        A    Yes.

4        Q    In that part of your statement were you

5    describing the suspect vehicle after the collision

6    between the suspect vehicle and Officer Mikowski's

7    vehicle?

8        A    Yes.

9        Q    At the time you gave your statement was it

10   your impression or you memory of the incident that it

11   was a possibility that the suspect vehicle was disabled

12   from the collision?

13       MR. CHRISTIANSEN:  Objection, the document speaks

14   for itself.

15       THE WITNESS:  No.  In that statement, if the

16   whole -- a few sentences down to -- I don't know if

17   you -- did you say all the way to 30?

18   BY MR. SINCICH:

19       Q    I was just referring specifically to the

20   majority of Line 27.  I'm just trying to get what your

21   impression was from your recollection at the time that

22   you gave this statement.

23       A    Yeah.  Again, it says in there and my

24   testimony would have said -- or my statement, what it

25   says is I didn't know if the vehicle -- because the

BLAKE WILLIAMS                                October 10, 2018

```
 1    vehicle was revving, tires were spinning, I did not know

 2    because the vehicle wasn't -- the sound of the vehicle,

 3    how high the vehicle was revving, wasn't consistent with

 4    how fast the vehicle was going.  So I didn't know if it

 5    was disabled or if it was pushing Officer Mikowski's

 6    vehicle.

 7              But if you read further, you say the -- I

 8    state that the vehicle was accelerating forwards and I'm

 9    unsure if it's just on Officer Mikowski's vehicle or if

10    it's going slow like that because it was disabled from

11    the collision.

12         Q   Well, is it fair to say that one of the

13    options that -- or possibilities that went through your

14    head at the time was that the suspect vehicle may have

15    been disabled?

16         MR. CHRISTIANSEN:  I'm going to object that it

17    misstates his testimony.

18         THE WITNESS:  I state in there, it's a -- I mean,

19    it's a possibility.  I -- I did not know if it was

20    disabled or still, you know, pushing against

21    Officer Mikowski's vehicle.

22    BY MR. SINCICH:

23         Q   You're --

24         A   But it was still accelerating forward.

25         Q   Right.  In your head at the time of the
```

BLAKE WILLIAMS                                          October 10, 2018

1    incident, were you thinking that it was also a

2    possibility that the suspect vehicle was attached to the

3    front of Officer Mikowski's vehicle?

4        A    I know you're saying "attached" because that's

5    in my statement, but I believe just kind of what I'm

6    testifying today, it was up against it because it just

7    collided with it.

8            So, I mean, touching, not physically like

9    attached or bonded, but up against Officer Mikowski's

10   vehicle is what I was describing.

11       Q    Okay.  So when you say the word "attached,"

12   what you're really referring to is -- is touching?

13       MR. CHRISTIANSEN:  Objection, asked and answered.

14       THE WITNESS:  Yes.

15   BY MR. SINCICH:

16       Q    At least in this portion of the statement?

17       A    Yes.

18       Q    Okay.

19       MR. SINCICH:  Do you think we can have one minute,

20   two minutes, just to see if Mr. Sehat has any questions

21   and then we can call it quits for today?

22       MR. CHRISTIANSEN:  Sure.

23       MR. SINCICH:  All right.  Let's go off the record

24   for a brief minute.

25       (Recess)

                                                          104

BLAKE WILLIAMS                                           October 10, 2018

1          MR. SINCICH:   Let's go back on the record.

2     BY MR. SINCICH:

3          Q    At some point in time after you gave your

4     statement, was there any kind of administrative leave

5     that you were on?

6          A    Yes.

7          Q    How long was that?

8          A    Three days.

9          Q    Is that a pretty standard amount of time after

10    an officer-involved shooting?

11         MR. CHRISTIANSEN:   Objection, calls for

12    speculation.

13         THE WITNESS:   Depends what department you work for.

14    Different departments have different protocol on what

15    happens after an officer-involved shooting.

16    BY MR. SINCICH:

17         Q    Okay.   Prior to going on administrative leave

18    did you have a tactical debrief?

19         MR. CHRISTIANSEN:   Objection, vague and ambiguous.

20         THE WITNESS:   We never really had a tactical

21    debrief, but I -- I -- I believe we debriefed the

22    incident.

23              I don't -- it wasn't directly after the

24    incident, it was shortly after, where everybody involved

25    including dispatchers and all of the officers involved

BLAKE WILLIAMS                                    October 10, 2018

1   the only statement.

2        Q   As part of the briefing that you alluded to

3   with all of the people involved in the incident, were

4   there any higher authority there that went over things

5   done well, things that needed to be improved upon?

6        MR. CHRISTIANSEN:   Objection, vague and ambiguous.

7   It calls for speculation.   Asked and answered.

8        THE WITNESS:   No.   I believe the only people that

9   were there in that was a -- it was a debrief amongst the

10  people that were there, the highest ranking person being

11  Sgt. Montez.

12        And it's kind of not really self-critiquing,

13  but just kind of telling what you -- you know, your side

14  of the story, what you did, why you did it kind of

15  thing.

16  BY MR. SINCICH:

17       Q   Was there any kind of critique of what the

18  officers did?

19       A   No.

20       Q   I can't recall if I asked you, so bear with me

21  if I'm asking it twice or even three times.

22        Did you have any information about either of

23  the suspects prior to you shooting Mr. Monzon?

24       MR. CHRISTIANSEN:   Objection, asked and answered.

25       THE WITNESS:   Prior information as -- I mean, I